### Linda Lee Hunt v. Eugene Earl Hunt

[648 A.2d 843]

No. 93-424

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed August 5, 1994

424

*Jeffrey L. Martin,* Waterbury, for Appellee Office of Child Support, Agency of Human Services.

*Jean A. Swantko,* Island Pond, for Defendant-Appellant.

**Allen, C.J.** Defendant Eugene Hunt was found in contempt of court for failure to comply with an order to pay child support. He appeals both the finding of contempt and the underlying support order, alleging that their imposition violates his right to free exercise of religion, as guaranteed by the First Amendment to the United States Constitution and Chapter I, Article 3 of the Vermont Constitution. We affirm the order of support, but vacate the judgment of contempt.

Defendant belongs to the Northeast Kingdom Community Church in Island Pond. In keeping with their faith in an "everlasting covenant" with God, described in Christian scriptures, members of the church lead an ascetic, communal existence. Members eschew all personal possessions and work for the benefit of the community, often in one of the various church-run business enterprises that offer goods to the public and provide income to the church. A recognized nonprofit corporation, the church pays taxes and meets all other obligations to the state. Defendant files tax returns reporting dividend income from the church, but has no access to the funds themselves, which apparently are retained in the church treasury. In return, the church provides for each member's housing and living necessities. The church does not believe in no-fault divorce, and forbids a member to support an estranged spouse or children who live outside the community.

Defendant has been a member of the church for the past fourteen years. Except for a brief period, defendant and his family lived in the church community at Island Pond. Plaintiff left the community with their children sometime in 1989, but defendant remained. Plaintiff began receiving Aid to Needy Families with Children (ANFC) benefits, and assigned all rights of child support to the Vermont Department of Social Welfare. Defendant refused to enter into a voluntary agreement to make periodic support payments in an amount satisfactory to the Commissioner of Social Welfare. Defendant maintained, and has continued to maintain, that he cannot sanction his wife's choice to leave him without just cause in the eyes of the church, and therefore cannot support his children outside the community. Further, defendant contends that because he himself owns nothing and cannot, consistent with his faith, work outside the community, he cannot earn money to meet a support obligation.

Nevertheless, he expresses concern for his children and his desire to care for them, which he asserts is possible only if they reside in the community with him. He has provided the children with shoes from the community cobbler shop where he works.

In early 1990, the Department of Social Welfare sought an order fixing a monthly child support payment amount and appropriate arrearages. A hearing was held before the Human Services officer, at which defendant represented himself. On April 18, 1990, the Human Services officer ordered defendant to pay fifty dollars per month for the support of his children, and to pay past amounts due for ANFC benefits already received.[1]

Plaintiff filed for divorce in August 1990, and the Office of Child Support (OCS) intervened on the issue of child support. Defendant appeared and testified at the hearings, but did not contest the divorce. In the final decree, plaintiff was given full parental rights and responsibilities for the minor children. On July 3, 1991, the family court, which assumed the former appellate jurisdiction of the Human Services Board, "affirmed" the decision of the Human Services officer. The court ordered a fifty-dollar-per-month child support obligation, and liability for amounts past due. After nearly a year with no payments, OCS filed a petition in August 1992 to find defendant in contempt of the family court's order. On April 20, 1993, at a conference before the family court concerning the contempt petition, defendant contended that he never had a proper opportunity to appeal the Human Service officer's finding that he had the ability to make child support payments. The family court granted defendant a de novo hearing on the issue of his ability to pay child support, as part of the hearing on the OCS contempt petition.

At the contempt hearing, the court took testimony from plaintiff, defendant, and an official of the church. The court found, as the Human Services officer had, that defendant has a ninth-grade education and no physical or mental infirmities that would prevent him from earning enough to meet the monthly support obligation. The court acknowledged defendant's claim that the church does not sanction no-fault divorce and that working outside the community would constitute a breach of faith, and found that his beliefs were

---

[1] In May 1990, defendant filed a notice of appeal from the hearing officer's decision with the Human Services Board, but no further action was taken because plaintiff had filed for divorce. In the interim, the Board was divested of jurisdiction in support cases. See 4 V.S.A. § 454(1) (family court has exclusive jurisdiction over support proceedings for all cases filed or pending on or after October 1, 1990).

sincerely held. The court further found that defendant had given up all his worldly possessions. For the purposes of its analysis, the trial court accepted "at full face value" the proposition that defendant's faith does not permit church members to earn an independent income. Nevertheless, the court concluded that defendant is an otherwise able-bodied individual, whose claim of incapacity arises from a conscious, controllable choice to adhere to certain religious tenets. Therefore, the court concluded, defendant has the ability to pay child support as "a matter of law." It also noted that "[m]atters of religious belief, as a matter of law, do not furnish an exemption from that ability [to pay]."

The court went on to find that the monthly support and arrearages were valid and enforceable obligations, and that defendant had the present ability to comply with the order. Defendant was held in contempt for his willful failure to comply with the order. On September 9, 1993, defendant was committed to the custody of the Commissioner of Corrections pending payment of $640, approximately one-quarter of his total obligation as of April 30, 1993. Defendant was released pending this appeal.

Defendant makes two interrelated claims, alleging violations of his right to free exercise of religion under the United States and Vermont constitutions. First, he contends that the support order is invalid because the hearing officer and the family court erred in finding that he has the ability to pay child support in any amount whatsoever. Second, defendant contends that the family court should have considered alternatives to contempt and incarceration to enforce the support order.

## I.

We begin with defendant's claim regarding the validity of the support order itself.

## A.

The State of Vermont recognizes the general duty of child support on the part of a parent: "The legislature . . . finds and declares as public policy that parents have the responsibility to provide child support . . . ." 15 V.S.A. § 650. To promote this policy, the family court must order "either or both parents . . . to pay an amount for the support of the child," *id.* § 658(a), which is allocated between the parents in proportion to their respective incomes, *id.* § 656(a).

However, in the case of the noncustodial parent, the family court may depart from the presumed total support obligation, as determined under the support guideline adopted under § 654.

If the noncustodial parent's available income is less than the lowest income figure in the support guideline . . . or is less than the self-support reserve, the court shall use its discretion to determine support using the factors in section 659 of this title and *shall require payment of a nominal support amount.*

*Id.* § 656(b) (emphasis added). This Court has noted in construing these provisions that "it is clear that the Legislature . . . intended to require at least a nominal child support award in all cases." *Viskup v. Viskup,* 150 Vt. 208, 210, 552 A.2d 400, 402 (1988).

In determining defendant's support obligation, the hearing officer calculated a monthly gross income of $480 in accordance with the relevant guidelines of 15 V.S.A. § 653(5):

"Gross income" means actual gross income of a parent. Gross income shall include:

. . . .

(B) expense reimbursements or in-kind payments received by a parent in the course of employment or self-employment or operation of a business if they reduce personal living expenses;

(C) in its discretion, the court may consider as gross income the difference between the amount a parent is earning and the amount a parent has earned in cases where the parent voluntarily becomes unemployed or underemployed, unless the parent is physically or mentally incapacitated.

15 V.S.A. § 653(5)(B), (C) (1989).[2] Of the $480, $180 was attributed to § 653(5)(B) in-kind payments, which must be included in gross income. The hearing officer exercised discretion under § 653(5)(C) to include the remaining $300 that defendant "could be receiving either through wages, worker's compensation or disability payments."

Defendant contends that imputing the $300 as gross income was an abuse of discretion, because his religious beliefs, not personal choice, bar him from accepting state benefits or wages from employment outside the community. Had this amount not been included, however, the mandatory inclusion of in-kind payments still would have resulted in a monthly gross income, for purposes of § 653, of $180. Since the hearing officer determined that the $480 monthly income amount was

___

[2] Section 653(5) was substantially amended, effective October 1, 1990.

less than the self-support reserve defendant was entitled to under § 653(7), an income of $180 would also fall below this minimum maintenance level. In either case, defendant has a gross income greater than zero but less than the self-support reserve, which requires the court to exercise discretion, considering the factors of § 659, in figuring a monthly support obligation. See 15 V.S.A. § 656(b). Therefore, if the hearing officer erred in not exercising discretion to exclude the income described in § 653(5)(C), the error is harmless.

■ ■ Defendant also asserts that § 659 may be construed to exempt him from the legal obligation to support his children. When defendant's child support obligation was first computed, § 659(a) read, in relevant part:

The total support obligation shall be presumed to be the amount of child support needed. If the court finds that a child support order based on the support guidelines would be inequitable, the court shall establish support after considering *all relevant factors, including but not limited to:*

(1) the guidelines for child support established under section 654 of this title;

(2) the financial resources of the child;

(3) the financial resources of the custodial parent;

(4) the standard of living the child would have enjoyed had the marital relationship not been discontinued;

(5) the physical and emotional condition of the child;

(6) the educational needs of the child;

(7) the financial resources and needs of the noncustodial parent; and

(8) inflation with relation to the cost of living.

15 V.S.A. § 659(a) (1989) (emphasis added).[3]

---

[3] Section 659(a) was amended, effective October 1, 1990:

The total support obligation shall be presumed to be the amount of child support needed. Upon request of a party, the court shall consider the following factors in respect to both parents. If, after consideration of these factors, the court finds that application of the guidelines is unfair to the child or to any of the parties, the court may adjust the amount of child support:

(1) The financial resources of the child.

(2) The financial resources of the custodial parent.

(3) The standard of living the child would have enjoyed had the marital relationship not been discontinued.

Defendant argues that the language "all relevant factors, including but not limited to," permits consideration of his ability to provide support in light of his religious beliefs, and gives the family court discretionary powers to relieve him of any support responsibility. We agree that the plain language of the statute ensures flexibility in situations in which a parent cannot meet the support amount suggested in the child support guideline, and that the nonexclusive list of relevant factors would not rule out consideration of religious beliefs in fixing the support amount. Nevertheless, the plain language of the statutory scheme mandates at least a nominal payment, notwithstanding the court's conclusions drawn from evidence regarding the ability to meet a regular support obligation. See 15 V.S.A. § 656(b).

■ Defendant does not contest the amount of the support award, but the fact that *any* payment at all was ordered. As a matter of fairness, the family court may depart from the presumed child support obligation in cases of hardship, but the Legislature has clearly required that *some* payment must be made. Cf. *Ainsworth v. Ainsworth*, 154 Vt. 103, 109–12, 574 A.2d 772, 775–78 (1990) (court has narrow discretion under § 659 to depart from guideline presumption). We cannot agree with defendant that the family court has the discretion not to order any support obligation if, as in this case, the parent has gross income as defined in § 653. Therefore, the order must stand unless it impermissibly infringes upon defendant's constitutional right to free exercise of religion.

## B.

The First Amendment to the United States Constitution mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. This provision binds the states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The Free Exercise Clause precludes all "gov-

---

(4) The physical and emotional condition of the child.

(5) The educational needs of the child.

(6) The financial resources and needs of the noncustodial parent.

(7) Inflation.

(8) The costs of meeting the educational needs of either parent, if the costs are incurred for the purpose of increasing the earning capacity of the parent.

(9) Extraordinary travel expenses incurred in exercising the right to periods of visitation or parent-child contact.

(10) Any other factors the court finds relevant.

ernmental regulation of *beliefs* as such." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963). Government may, however, under certain circumstances, impinge on an individual's actions in accordance with those beliefs in exercising the power to prescribe or proscribe conduct. See, e.g., *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 890 (1990) (members of Native American Religion who smoked peyote as part of ritual ceremony not exempt from general criminal ban on the substance); *United States v. Lee*, 455 U.S. 252, 261 (1982) (Amish employer must pay Social Security taxes despite religious prohibition against participation in governmental support programs); *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878) (no exemption for adherents of Mormon faith from laws prohibiting polygamy).

Before *Smith*, no clear standard existed for determining whether governmental interference with free exercise was legitimate. See *Smith*, 494 U.S. at 876–89 (discussing inconsistent use of strict scrutiny standard promulgated in *Sherbert v. Verner* and other approaches to free exercise cases); cf. Note, *Smith and the Religious Freedom Restoration Act: An Iconoclastic Assessment*, 78 Va. L. Rev. 1407 (1992) (agreeing that no standard consistently employed, but differing with some of *Smith*'s conclusions). The Supreme Court attempted to forge a uniform standard in *Smith*, holding "that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, — U.S. —, —, 113 S. Ct. 2217, 2226 (1993).

In response to *Smith*'s "virtual elimination" of the mandate that government justify burdening religious practice through neutral laws, the United States Congress passed the Religious Freedom Restoration Act of 1993, P.L. 103–141, 107 Stat. 1488 (codified at 5 U.S.C. § 504; 42 U.S.C. §§ 1988, 2000bb, 2000bb-1 to -4), explicitly overruling *Smith*. The Act's stated purpose is "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). The Act provides that government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates that burdening the person (1) furthers a compelling governmental interest, and (2) advances that interest in the least restrictive means possible. *Id.* § 2000bb-1(a), (b).

In short, the Act demands that all governmental action that substantially interferes with the free exercise of religion be justified under a traditional strict scrutiny analysis.[4]

■ The fact that the Act was passed in November 1993, after the entry of the support and contempt orders at issue, does not prevent its application in this case.[5] Section 6, entitled "Applicability," states that the Act "applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and *whether adopted before or after the enactment of th[e] Act.*" *Id.* § 2000bb-3(a) (emphasis added). The statutory language evinces clear congressional intent that the law apply retroactively. Thus, we conclude that the Religious Freedom Restoration Act controls our analysis of defendant's free exercise claim under the federal constitution. See *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 837 (1990) (act must be retroactively applied if congressional intent clear).

To assess the validity of the child support order, we must first make the threshold determination of whether it substantially burdens defendant's sincerely held beliefs. If so, we proceed to scrutinize the nature of the State's interest and the means used to further that interest. Defendant must show the burden on his religious practice. *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 223 (1963). The State has the burden of proving its actions are the least restrictive means of advancing a compelling interest. 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(3).

■ At the contempt hearing, in which the court considered de novo the question of ability to pay, defendant produced uncontested evidence of the nature of his religious beliefs and life in the community. We emphasize that matters of faith "need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Empl. Sec.*

---

[4] In overruling *Smith* and reestablishing the strict scrutiny standard as the touchstone for permissible governmental interference with free exercise rights, Congress has construed the Free Exercise Clause of the United States Constitution. Thus, though a federal law guides our analysis, because the Act defines the meaning of the federal constitution our resolution of this case rests on a constitutional as well as statutory basis. We express no opinion on the constitutionality of the Act.

[5] The effect of the Religious Freedom Restoration Act was not addressed in the briefs, because it became law after they were submitted to this Court. The parties were given the opportunity to review their positions in light of its requirements. Defendant agrees with the retroactive applicability of the Act; the State contends, contrary to our conclusion, that the Act may be applied only prospectively.

*Div.*, 450 U.S. 707, 714 (1981). It follows that the court must accept at face value the asserted impact of government action on an individual's free exercise of religion, provided the beliefs are sincerely held. *Lee*, 455 U.S. at 257. In this case, the trial court found that defendant is sincere in his religious devotion. The court acknowledged defendant's claim that he cannot support his wife and family in their lives outside the community, and that seeking employment outside the community to meet a support obligation would be completely contrary to his faith.

Nevertheless, the court concluded that a support obligation would burden defendant only incidentally. Neither the evidence offered nor the court's findings, however, support this conclusion. See V.R.C.P. 52(a); *Nickerson v. Nickerson*, 158 Vt. 85, 88–89, 605 A.2d 1331, 1333 (1992) ("Findings of fact, from which conclusions of law flow, will not be set aside unless clearly erroneous."). A state-imposed obligation that indirectly compels defendant to risk significant penalties if he chooses to adhere to his faith creates a substantial free exercise burden. Cf. *Yoder*, 406 U.S. at 218 (impact of compulsory school attendance law on Amish religion "severe and inescapable" because of threat of criminal sanction). In this case, to conclude otherwise unjustly denigrates the importance of defendant's religious beliefs.

We proceed to consider the nature of the State's interest and the means used to advance that interest. Unquestionably, the State has a significant interest in promoting the health and welfare of children, which includes ensuring that parents who have separated bear responsibility for support. See 15 V.S.A. § 650. The support obligation seeks to provide the children with stability by maintaining their accustomed standard of living, and to lessen the drain on public resources caused by public assistance programs. As a matter of social policy, the support obligation also fosters responsibility in parents for their children. We conclude that parental support of children is a compelling state interest.

The child support order is valid if the order to pay support is the least restrictive means to further the state interest. 42 U.S.C. § 2000bb-1(b)(2). The evidence is undisputed that the State requested that defendant voluntarily assume his portion of the total support responsibility, and that defendant refused for the same religious reasons he contends render him unable to meet any payment obligations. Leaving aside the question of arrearages,

defendant's lack of custody of his son[6] prevents defendant from providing for him in the future in accordance with the tenets of his faith. Vermont has no other established means for the state to require parents to meet their support obligations. Lacking any other practical means to impose the support obligation, a court order is the least restrictive means to establish such an obligation to further the state's interest in child support.

We conclude, then, that the order was legitimately imposed, despite the fact that it burdens defendant's free exercise of religion by saddling him with a legally enforceable obligation to support his children outside of marriage and the church community. The order represents the least restrictive means for the state to further a paramount interest in having parents recognize their obligation to provide material support for their children. Therefore, the order does not offend defendant's right to free exercise under the First Amendment to the United States Constitution.

## C.

■ This does not end our scrutiny of the order, however, because defendant also claims that its imposition violates his rights under Chapter I, Article 3 of the Vermont Constitution. In relevant part, Article 3 establishes:

> That all men have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; . . . and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship.

Vt. Const., ch. I, art. 3. We bear in mind that First Amendment restrictions on the state preclude a construction of Article 3 that would afford an individual less protection of the right to free exercise of religion than that guaranteed under the federal constitution. See *In re E.T.C.*, 141 Vt. 375, 378, 449 A.2d 937, 939 (1982). Of course, the state constitution may afford greater protections to this right. See *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982). But in light

---

[6] Of the three children, only the youngest is still a minor. The court may not order support payments after a child has attained the age of majority or has terminated secondary education, whichever is later. 15 V.S.A. § 658(c).

of the Religious Freedom Restoration Act, greater protection under the state charter would require even greater obstacles to state action than those raised by the strict scrutiny test.

Though this Court has had few opportunities to construe the Article 3 guarantee, we find one of the more recent cases, *State v. DeLaBruere*, 154 Vt. 237, 577 A.2d 254 (1990), particularly instructive for its comprehensive analysis of Vermont's free exercise provision. *DeLaBruere* concerned a free exercise challenge under the state and federal constitutions to the state's compulsory education law. The defendants had supported their claim for greater state constitutional protection with a variety of interpretational approaches: historical analysis, examination of the text, other states' interpretations of similar provisions in their own constitutions, and sociological materials. *Id.* at 262–63, 577 A.2d at 268. We concluded "that at least with respect to the claims made in this case, we can find no basis for the argument that the Vermont Constitution affords additional protection to defendants." *Id.* at 265, 577 A.2d at 270. Though *DeLaBruere* was decided before the promulgation of the Religious Freedom Restoration Act, this conclusion endures, because the First Amendment analysis in that case essentially duplicates the strict scrutiny standard now mandated under the Act for free exercise claims. See *id.* at 249, 577 A.2d at 261.

Based on *DeLaBruere*, we see no principled basis to say that the Vermont Constitution offers greater protection for a free exercise claim such as defendant's than the strict scrutiny standard at issue. An examination of the relevant case law revealed Article 3 to be more an antidiscrimination provision, adopted by a people whose "'militant sense of freedom . . . was somewhat reserved in expression of religious liberty.'" *Id.* at 264, 577 A.2d at 269 (quoting *Swart v. South Burlington Town Sch. Dist.*, 122 Vt. 177, 182, 167 A.2d 514, 517, *cert. denied*, 366 U.S. 925 (1961)). In addition, an examination of relevant decisions from other states' constructions of their own free exercise provisions revealed that, almost without exception, none offered more protection to religious practice than that required by strict scrutiny. See *id.* at 266–69, 577 A.2d at 270–72.

Defendant fails to offer, and we have not discovered, reason to construe Article 3 to provide any greater protection than that afforded by strict scrutiny. See *Varnum v. Varnum*, 155 Vt. 376, 381–87, 586 A.2d 1107, 1110–13 (1990) (post-*DeLaBruere* case with no analysis, separate and distinct from First Amendment, of Article 3 claim that family court violated mother's free exercise rights by

factoring religious beliefs and practices into child custody determination). As evidence that Article 3 guarantees greater deference to religious liberty, defendant points to *Beauregard v. City of St. Albans*, in which this Court found "mere interference" with free exercise sufficient to invalidate a will provision that restricted the religious affiliation of members of a public school board. 141 Vt. 624, 632, 450 A.2d 1148, 1152 (1982). But in *DeLaBruere* we scrutinized *Beauregard* and concluded that despite its broad pronouncement, the decision lacked real analysis and "fell squarely within the anti-discrimination construction of Article 3." *DeLaBruere*, 154 Vt. at 265, 577 A.2d at 270.

Therefore, in the context of a free exercise challenge founded on an order to pay child support, we hold that Chapter I, Article 3 of the Vermont Constitution protects religious liberty to the same extent that the Religious Freedom Restoration Act restricts governmental interference with free exercise under the United States Constitution. As a result, the court order to pay child support, valid under the First Amendment, also withstands scrutiny under the Vermont Constitution.

## II.

■ In contrast to the support order, the contempt order does not stand up to scrutiny under either the federal or state constitution, because the order has not been shown to be the least restrictive means of furthering the state's interest in parents supporting their children.

Under 15 V.S.A. § 603, "[a] person who disobeys a lawful order or decree of a court or judge . . . may be proceeded against for contempt . . . ." Upon determining that the subject of a valid, enforceable order is capable of complying but refuses to do so, the family court may exercise its discretion to impose sanctions for contempt. See *Andrews v. Andrews*, 134 Vt. 47, 49, 349 A.2d 239, 241 (1975). In cases of noncompliance due to a claimed financial inability, the court must find a present ability to pay before the defendant may be found in contempt. *Steele v. Steele*, 142 Vt. 112, 114, 453 A.2d 400, 401 (1982). Ordinarily, use of the contempt power is subject to review only for an abuse of discretion. *Brown v. Brown*, 140 Vt. 56, 58, 435 A.2d 949, 951 (1981).

In this case, defendant contends he failed to comply with the support order because of financial inability—that his religious beliefs preclude him from personal ownership of property or employment

outside the community. As part of the contempt proceeding, the trial court conducted a de novo hearing on defendant's ability to meet the child support obligation, both at the time of the contempt hearing and at the time the original support order was entered. Conceding the sincerity of defendant's religious beliefs, the court found that nothing other than those beliefs prevented him from earning enough, either at the time the order was originally imposed or at the time of the contempt hearing, to meet a support obligation. Concluding that defendant, capable of compliance, had willfully failed to comply with a valid court order, the court found him in contempt and ordered incarceration.

Defendant contends that the contempt order and subsequent incarceration violated his free exercise rights. To assess the merit of his claim under the First Amendment, we again employ the framework of the Religious Freedom Restoration Act: the state may substantially burden defendant's religious liberty only after demonstrating that its actions with regard to defendant are the least restrictive means of advancing a compelling state interest. 42 U.S.C. § 2000bb-1(b).

■ The argument regarding enforcement differs from that regarding imposition of the original support obligation. Defendant's objection to the support obligation, which is distinct from how that obligation is enforced, proceeds from the church's proscription of no-fault divorce. There is no evidence that the obligation per se offends any other tenet of his faith. The state's manner of enforcement, however, compelled defendant to choose between jail time and violation of another religious belief: that he not earn an independent income outside the church community. Either option would result in defendant's separation from the community. Therefore, the order and possibility of incarceration substantially burdened defendant's free exercise of religion.

Enforcement of child support orders furthers the same policies promoted by imposition of the original obligation. As noted above, the state has a compelling interest in securing support for children from parents no longer sharing the same household. Contempt and incarceration represent means of furthering that interest, but the Religious Freedom Restoration Act puts the burden upon the State to show that they are the means least restrictive of defendant's religious freedom.

■ In the contempt hearing, the State offered no evidence that it was pursuing the least restrictive alternative. Essentially, the State

sought a harsh sanction in a case of imputed income. At oral argument before this Court, counsel for OCS acknowledged that his office exercises considerable discretion in pursuing delinquent obligors. OCS generally follows up on cases with a "reasonable possibility" of successful collection—generally, not delinquent obligors without assets or employment. The State has failed to establish that contempt and jail are the least restrictive means to further the state's compelling interest in enforcing the child support obligation. Contempt and incarceration are not, per se, impermissible infringements on free exercise, and may be imposed provided the State makes the requisite showing as mandated by the Religious Freedom Restoration Act. In this case, however, the State has failed to make this showing, and therefore the contempt order impermissibly burdens defendant's free exercise rights as guaranteed by the federal constitution.

## III.

In summary, we hold that the child support order, though a substantial burden on defendant's rights to free exercise of religion under the United States and Vermont Constitutions, is the least restrictive means of furthering a compelling governmental interest. The contempt order, however, must be vacated because the State has not demonstrated that contempt and incarceration are the means to enforce the support order least restrictive of defendant's free exercise rights under the United States Constitution.

*The order of the Human Services officer imposing a monthly support obligation and requiring payment of arrearages is affirmed. The order of the family court finding defendant in contempt is vacated and the matter is remanded for a hearing as to the least restrictive means to enforce defendant's support obligation.*

**Morse, J.,** concurring and dissenting. In my view this case does not necessarily present a clash between the free exercise of defendant's religion and a child's right to support. I would therefore reverse on a narrower ground and not remand.

Defendant's inability to pay child support is no different had he worked for any employer who for any reason paid compensation other than with money. I agree with the dissent of Justice Dooley that "[i]n an economic sense, the church is defendant's employer" and that the burden should be on the State to collect child support in cases like this from the custodian of the money held for defendant's benefit. I believe the State could proceed directly against the church under garnish-

ment, given the broad definition of "wages" in 15 V.S.A. § 780(9), or trustee process. The sanction of imprisonment for contempt is the most drastic remedy, and its imposition is an abuse of discretion if alternative effective remedies are reasonably available. See *Spallone v. United States*, 493 U.S. 265, 276 (1990) (in selecting civil contempt sanctions, court must use least possible power to achieve desired end). The challenge based on free exercise of religion is premature at this point.

I would reverse the order of contempt, which would leave the State free to pursue, if it wishes, alternative remedies.

**Dooley, J.**, dissenting. I do not believe that the order to pay child support in this case can stand consistent with the First Amendment as interpreted by the Religious Freedom Restoration Act of 1993. Two factors are critical to my view.

First, the real source of the controversy is the communal living arrangement required by the Northeast Kingdom Community Church. Defendant works as a cobbler and salesman in the church cobbler shop. All income from his work effort goes directly to the church and, in turn, all of his needs are met by the church. Defendant has no individual income or assets. This communal living arrangement is commanded by church doctrine; defendant cannot be a church member without residing in the church community and participating in its economy.

Second, the issue is whether defendant can be required to pay a nominal amount of child support even though the guideline calculation would otherwise exempt him. Under our guideline system, an obligor spouse is assigned a "self-support reserve," which is "an amount sufficient to provide a reasonable subsistence compatible with decency and health." 15 V.S.A. § 653(7). The point of the self-support reserve is that it represents an income floor beneath which the obligor should not be taken in order to pay child support. Thus, when the obligor's income is above the self-support reserve, but a support order calculated under the guidelines would leave the obligor with income below the self-support reserve, the support amount is presumed to be the difference between the obligor's income and the self-support reserve. See *id.* § 656(c). This rule leaves the obligor the amount of the reserve to meet his or her own needs. When the obligor's income starts out below the self-support reserve, the policy is essentially the same except that the court must "require payment of a nominal support amount." *Id.* § 656(b).

Although the requirement of at least a nominal payment is understandable, it has the perverse effect of leaving the lowest income obligor with a smaller income than that retained by an obligor with an income slightly above the guidelines. In this case, it also creates a constitutional conflict. Defendant has no cash income, so he is well below the self-support reserve. The trial courts imputed income to defendant because he has the employment history and current skills that would allow him to work and support his children outside the church. They also noted that defendant's individual income tax returns reflected income of $2,300 per year, which represented that portion of total church income assigned by the church to defendant. Even after income imputation, however, defendant's income falls below the self-support reserve.

As the majority recognizes, the purpose of the Religious Freedom Restoration Act was to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398, 403 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972). *Sherbert* noted that "a rational relationship to some colorable state interest" is insufficient; instead, "'[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" *Sherbert*, 374 U.S. at 406 (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). *Yoder* explained that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S. at 215.

I emphatically agree with the majority about the importance of child support obligations and requiring that parents honor them. Therefore, I would ordinarily find that child support laws further a compelling governmental interest. In this case, however, we have a clash of principles with virtually no economic or social substance. The sole policy in issue requires every parent with a child support obligation, no matter how low his or her income, to pay at least a small amount of child support to maintain that sense of obligation. I support that policy, but I can not accept that it involves a "paramount" state interest or an interest "of the highest order." The very nature of First Amendment balancing requires us to be discerning about the interests involved and the methods employed. See *Yoder*, 406 U.S. at 221 (when Amish refused to send children to public school beyond the eighth grade, Court could not accept "sweeping claim" of compelling interest in compulsory education; Court must "searchingly examine" state interest in policy in dispute). The symbolism of a "nominal" child support order does not rise to the level of state interest necessary to substantially burden a parent's free exercise of religion.

In evaluating the state interest involved here, it is instructive how the issue of nominal payment is handled in the federal child support enforcement scheme and in the other states, which like Vermont have adopted child support guidelines. Pursuant to the Family Support Act of 1988, states are required to adopt child support guidelines and adopt a rebuttable presumption that in each individual case the amount of child support ordered will be based on the guidelines. See 42 U.S.C. § 667 (1988); 45 C.F.R. § 302.56 (1993). There is no requirement in federal law that courts order at least a nominal amount of support in every case, no matter how low the income and resources of the obligor parent. Although I do not have an exact count, the reported decisions suggest that unlike Vermont, most states do not require very low income obligors to pay child support. See *Hannah v. Hannah*, 582 So. 2d 1125, 1126 (Ala. Civ. App. 1991) (when noncustodial parent has no ability to pay, it is improper to order parent to pay child support); *Schneider v. Schneider*, 473 N.W.2d 329, 332 (Minn. Ct. App. 1991) (absent finding of bad faith, trial court can not order child support against parent unable to pay because of unemployment); *State ex rel. Wilcox v. Strand*, 442 N.W.2d 256, 258 (S.D. 1989) (upholding refusal of trial court to order child support against parent because of parent's limited ability to pay); *Glenn v. Glenn*, 848 P.2d 819, 822 (Wyo. 1993) (incarcerated parent without income or assets not subject to child support order). The different attitudes on obtaining support orders in every case is demonstrated by *Wilcox*, in which an attempt by the state to obtain an order against a parent because she was capable of working but was voluntarily unemployed brought a hostile reaction from the court: "[t]he burden on the judicial caseload enhanced by this sort of action and appeal is not appreciated." *Wilcox*, 442 N.W.2d at 258.

Although the parties have not raised this point, there is a serious question whether Vermont's requirement for a support order from every noncustodial parent is consistent with the federal requirement that guidelines take into consideration the income of the absent parent and operate as rebuttable presumptions. See 42 U.S.C. § 667(b)(2). The issue was litigated in New York, which by statute requires an award of at least $25 per month per child, and the New York Court of Appeals struck down the nominal amount requirement as inconsistent with federal law. See *Rose v. Moody*, 629 N.E.2d 378, 381, 607 N.Y.S.2d 906, 909 (1993), *cert. denied*, — U.S. —, 114 S. Ct. 1837 (1994). The court reasoned: "For a judicial decree to declare that [the parent] . . . owes what she cannot realistically or legally pay is

not only unjust and inappropriate, it is a legal pretense." *Id.* Thus, the nominal-amount provision violated the federal requirement that the obligor be able to rebut the guideline amount when he or she can show that application of the guidelines would be "unjust or inappropriate" in a particular case. *Id.*

I think it ironic that a policy the New York Court of Appeals found not to be legally sustainable is found by this Court to involve a compelling state interest that overrides a claim of religious liberty. Whether the New York court is right or wrong, it is clear that we can reach the majority's result only by accepting that virtually any state interest is sufficient to trump a religious liberty claim under the *Sherbert* and *Yoder* decisions. The Religious Freedom Restoration Act plainly demands more than this lip-service tribute to the free exercise of religion.

Even if I agreed that a child support order in this case advanced a compelling state interest, I cannot agree that it advances the "interest in the least restrictive means possible." Whatever income is earned from defendant's labor is retained by the church. In an economic sense, the church is defendant's employer. By requiring wage withholding in most child support cases involving employed obligors, 15 V.S.A. § 781(a), the state has found that employers have an obligation to help create a workable system of child support enforcement. I see no reason why the state could not legislate that the income that flows to the church from defendant's labor is encumbered by defendant's obligation of support. Thus, the payment obligation would be placed on the church, which has the income and assets from which collection is achievable. This obligation is no different from those placed on the church by taxation or Social Security laws with which it must comply. See, e.g., *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 392 (1990).

Although the majority is remanding to determine whether there is a less restrictive alternative than contempt, there is no indication of an alternative under present law. Thus, it is highly likely, if not inevitable, that we will again imprison defendant in an attempt to make him pay what he does not have. The real dispute here is between the State and the church, and I do not believe that we are justified in holding a church member hostage to this dispute. If the State is correct that its interests are so fundamental that they must be enforced in these circumstances, this Court should insist that they be enforced directly against the church that retains the income in issue.

For the above reasons I would hold that the nominal support payment order can not be enforced against defendant consistent with his right to free exercise of religion. I dissent.