2005 VT 93

## Susan Connal ROOT v. A. Kenneth ROOT

[882 A.2d 1202]

No. 04-015

¶ 1. August 2, 2005. Mother appeals from the family court's order finding her in contempt and modifying father's spousal maintenance obligation. We affirm the court's contempt finding but reverse its modification order.

¶ 2. Mother and father divorced in February 2000 after approximately sixteen years of marriage. Mother was awarded sole legal and physical parental rights and responsibilities for the parties' four minor children. Father was granted liberal parent-child contact. The final divorce order required that the parties mediate any disputes involving the parent-child contact schedule. At the time of their divorce, both parties resided in Killington, Vermont. Father was employed as a sales associate with Killington Valley Real Estate; mother had not worked outside the home for approximately thirteen years.

¶ 3. The parties had significant marital debt as well as several income-producing assets. One such asset was a parcel of property, referred to as the Bigelow Drive property, which contained both commercial and residential space. At the time of the final divorce order, Alan Neveu was operating a ski rental shop in the commercial space and paying $1298 in monthly rent. Mr. Neveu was also paying the parties approximately $2700 per month on a promissory note, which was to be paid in full on November 30, 2000.

¶ 4. Father was ordered to pay mother monthly rehabilitative maintenance between December 1, 2000 and December 31, 2005 as follows: $1500 directly from

father; $1298 in commercial rent from the Bigelow Drive property; and $450 in rent for an apartment at the Bigelow Drive property. The court stated that father could keep any increase in rental income from these properties but conversely, should the rental incomes decline, he remained obligated to pay the amounts set forth in the order. The court indicated its expectation that father's income would increase during this five-year period and mother would obtain wage-producing income.

¶ 5. In August 2001, mother relocated to Connecticut with the children without consulting father. Father filed an emergency motion to compel mother to comply with the parent-child contact schedule set forth in the final divorce order, and he asked the court to hold mother in contempt for deliberately violating the order. Mother then filed a motion to enforce father's outstanding spousal maintenance obligation and to hold him in contempt. Father responded with a motion to modify his maintenance obligation, asserting that he no longer had the ability to pay rehabilitative maintenance as set forth in the final divorce order.

¶ 6. Father made the following arguments in support of his motion to modify. At the time of the final divorce hearing, the Bigelow Drive commercial premises had been rented to Alan Neveu for $1298 per month. Father believed that Mr. Neveu would renew the lease but Mr. Neveu did not do so, and the lease expired on November 30, 2000. By that time, it was too late to rent the premises to another tenant so father reinstituted the ski rental business and ran it himself through the winter of 2000-2001. Although the ski rental business produced revenues, it barely broke even. As a result, father had not received rent for the commercial premises, and his revenues from the ski business were insufficient to pay the rental equivalent portion of his maintenance obligation that had previ-

ously been paid by Mr. Neveu. The abandonment of the ski rental business by its former tenant was unanticipated by father, and it constituted a real, substantial, and unanticipated financial change since the final divorce order. Father also maintained that because of a downturn in the real estate market, he had fewer commissions available to him, which also constituted a real, substantial, and unanticipated change in circumstances.

¶ 7. After four days of hearings, the court issued an order finding mother in contempt and reducing father's maintenance obligation. As to the first issue, the court explained that under the terms of the parties' final divorce order father had been granted visitation every other weekend, and on Monday and Wednesday evenings, with an overnight stay on Wednesdays. The order also provided that the children could telephone either parent as they wished. Mother left Vermont with the children in August 2001; she did not discuss her move with father beforehand, she did not file a motion to modify the parent-child contact order, and she did not engage in mediation as required by the divorce order. The court rejected mother's assertion that she had made a last-minute decision to relocate, finding her testimony not credible. The court found that Judge Cohen had ordered mother to comply with the existing contact order at an August 2001 hearing, where mother participated by telephone. Mother did not comply with the contact order, however, and father was routinely unable to parent the children on a regular schedule without court intervention. Mother also put a block on her telephone, which prevented the children from calling father.

¶ 8. In reaching its conclusion, the court recognized the financial realities that had precipitated mother's move, but it found that this did not provide a basis for mother to relocate without first addressing how father would exercise his right to parent the children. The court explained that the parties' final divorce order had contemplated that mother would attempt to subvert father's parenting of the children, which was why the order included a mediation provision. The final order also contained a detailed parenting schedule to limit the need for any "negotiation" between the parties. The court concluded that mother was aware of the terms of the final divorce order and its parent-child contact provisions, and she had intentionally prevented father from parenting the children in accordance with that schedule. The court also found that mother was aware of Judge Cohen's verbal order directing that parent-child contact would continue as set forth in the final order and she had intentionally violated that order as well. The court found that mother's actions constituted clear and substantial violations, and it therefore found her in contempt.

¶ 9. The court also granted father's motion to modify spousal maintenance after finding that there had been a real, substantial, and unanticipated change in father's financial circumstances since the final divorce order. The court explained that a partial source of father's maintenance payment had been rental payments from Mr. Neveu, and this income source had ceased in November 2000 when Mr. Neveu failed to renew his lease. The court stated that while father had taken over the ski rental business from Mr. Neveu, he had not had sufficient time to market it during the 2000-2001 season and the business had broken even. The court also found that the final divorce order contemplated that father's income from real estate commissions would increase over the five-year period of rehabilitative maintenance, and the evidence showed that his income from the real estate business had decreased in 2001. The court noted that the final divorce order also contemplated that

mother would obtain outside employment to supplement her income. The court found that mother had not made any effort to obtain job skills while living in Vermont, and she continued to assert that she could not parent and work at the same time.

¶ 10. As to father's income, the court made the following specific findings. Father's gross income in 2000 was $53,717, $45,000 of which was from real estate commissions. In 2001, father received approximately $29,500 in real estate commissions. Relying on an exhibit prepared by father, the court found that father had received $16,000 in net income from his ski rental business between June 2001 and April 2002. The court concluded that father had less income than he did in 1999 because the promissory note payments from Mr. Neveu had ceased. As noted above, the court also found that the income from the commercial rental of the Bigelow Drive property had ceased in November 2000. Adopting a May 2001 finding by a magistrate, which was made in connection with child-support proceedings, the court concluded that father's current income from all sources was approximately $4300 per month. After reviewing father's expenses, the court concluded that father had the financial ability to pay $850 per month in rehabilitative maintenance. The court also retroactively reduced father's maintenance obligation by $1298 per month between March 2001 and January 2003, which represented the commercial rent from the Bigelow Drive property, and it reduced father's $1500 per month payment to $850 as of April 2001. Mother appealed.

¶ 11. We first address mother's challenge to the court's contempt finding. Mother maintains that she should not have been found in contempt of Judge Cohen's verbal order because she was not present at the hearing and she had no knowledge of the order. She also argues that it was physically and financially impossible for her to comply with the parent-child contact provisions of the final order, and the court therefore erred in finding her in contempt.

¶ 12. Contempt proceedings in family court are governed by 15 V.S.A. § 603 and Rule 16 of the Vermont Rules for Family Proceedings. The family court may hold a parent in contempt if it finds a clear and substantial violation of a court order. V.R.F.P. 16(b)(1), (5). We will reverse an order of contempt only if it is shown on appeal that the court abused its discretion by issuing the order. *Hunt v. Hunt*, 162 Vt. 423, 436, 648 A.2d 843, 853 (1994). The court did not abuse its discretion here.

¶ 13. First, mother's assertion that the court held her in contempt of the interim order misconstrues the clear language of the order being appealed. The court found mother in contempt of the final divorce order as well as Judge Cohen's interim order. Mother claims that there is no support in the record for the court's finding that she was present at the hearing before Judge Cohen, and therefore she didn't know about the order. We agree that mother must have had knowledge of the order to be in contempt of it. *Lyon v. Lyon*, 143 Vt. 458, 461, 466 A.2d 1186, 1188 (1983). But any error in the court's finding regarding mother's presence at the hearing is harmless. Judge Cohen's order simply reiterated mother's preexisting obligation under the final divorce order, which mother concedes that she did not follow, claiming that it was impossible for her to do so. Thus, even if the court erred in finding mother present at the hearing before Judge Cohen, she was still in contempt of the final order. We will not reverse when, as here, the court commits an error that is harmless. V.R.C.P. 61.

¶ 14. We are equally unpersuaded by mother's second claim of error. The court rejected as not credible mother's reasons

for her noncompliance with the final divorce order. Mother claimed that she could not follow the order due to her "forced" move to Greenwich. The court found that mother's move was a wilful violation of the order and that she never sought to modify it before removing the children from Vermont. The court also found her in contempt of the order by not engaging in mediation before moving out of the state. The court explained that the "Final Order envisioned continuing attempts by [mother] to subvert [father's] parenting of the children which necessitated the inclusion of a mediation clause." The mediation provision was an important part of the final order and was put in place in anticipation that mother would engage in the type of obstructive behavior giving rise to the order at issue here.

¶ 15. The court was also unpersuaded by mother's claim that she was completely unable to comply with the order on parent-child contact due to her financial circumstances, which she claimed were all father's fault. The family court disagreed with mother's characterization of her circumstances, and explicitly found that she lacked credibility. Mother's credibility was a matter for the trial court's consideration, and we do not review it. *Kanaan v. Kanaan*, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (recognizing that trial court "is in a unique position to assess the credibility of the witnesses and the weight of the evidence presented"). We note that in the final divorce order, the findings of which the court adopted as part of the order at issue here, the court found that after the divorce mother would not be able to continue being a full-time parent with no outside earned income. The court expected that mother would make efforts to find employment to supplement the temporary spousal maintenance she received from father. In the contempt order, the court found no evidence that mother made any efforts to become employed while in Vermont, and further found that, notwithstanding the findings in the final order of divorce. mother continued to assert that she could not work and parent at the same time. We find no abuse of the court's discretion in holding mother in contempt of the parent-child contact order because she did not convince the court that her move was "forced."

¶ 16. Mother next argues that as the sole legal and physical custodian of the children, she had an absolute right to move where she wanted irrespective of father's right to parent-child contact. She also maintains that a remand is necessary so that the family court can revisit the issue of parental rights and responsibilities in light of her move. These arguments are without merit. First, our precedents do not give mother an absolute right to live wherever she wants if doing so makes it impossible for father to exercise his rights to parent the children. See, e.g., *deBeaumont v. Goodrich*, 162 Vt. 91, 99, 103, 644 A.2d 843, 848, 850 (1994) (explaining that primary custodian's decision to move should be given deference but upholding family court's decision to transfer primary custody of children to parent residing in Vermont after other parent moved out of state). Mother's second argument is somewhat confusing in view of the court's order on the parent-child contact issue. The family court did revisit parental rights and responsibilities by modifying the terms of father's contact with the children. Mother may be dissatisfied with the terms of the new provisions, but she has not presented an argument that the terms are unwarranted. In fact, her argument ignores what the court actually did after the four days of hearings on the parties' motions. There is no basis for a remand on this issue.

¶ 17. Finally, mother challenges the court's order modifying father's spousal maintenance obligation. She argues that the court erred in finding that the com-

mercial rental income for the Bigelow Drive property ceased in November 2000. She also asserts that the court failed to properly assess father's income.

¶ 18. The family court has discretion when deciding a motion to modify maintenance under 15 V.S.A. § 758. *Stickney v. Stickney*, 170 Vt. 547, 548-49, 742 A.2d 1228, 1231 (1999) (mem.). The court must find "'a real, substantial, and unanticipated change of circumstances'" before revisiting the amount of rehabilitative maintenance to award the recipient spouse. *Id.* at 548, 742 A.2d at 1231 (quoting 15 V.S.A. § 758). An order modifying maintenance may be set aside on appeal "only when there is no reasonable basis to support it." *Id.* at 549, 742 A.2d at 1231. As discussed below, the court's findings relating to father's income are not supported by the evidence, and we therefore reverse its order.

¶ 19. First, the family court erred in concluding that the income from the commercial rental of the Bigelow Drive property, which was owed to mother under the terms of the final divorce order, became unavailable after November 2000 when Mr. Neveu failed to renew his lease. A business income statement prepared by father shows that father's business, ARK Transportation, Inc., paid $30,000 to rent the Bigelow Drive property between June 2001 and April 2002. Not only are these payments reflected on father's own income statement, but father also testified to this effect at the hearing; he acknowledged receiving the rental payments at oral argument before this Court; and his bank statements reflect rent payments from his business to himself. The family court relied on father's income statement in finding that father's net income from the ski rental business between June 2001 and April 2002 was approximately $16,000, but it failed to explain why the rental payments reflected on this same exhibit should not be considered as income to father, nor why father should be excused from paying this rent over to mother consistent with the terms of the final divorce order.[1]

¶ 20. Compounding this mistake, the family court also erred in calculating father's income. The court found that father had a monthly income from all sources of approximately $4300, adopting a magistrate's May 2001 finding to this effect. The final hearing before the family court was conducted almost one year after the magistrate made her finding, however, and evidence was presented to the family court regarding father's current financial situation, which included income that father received from his ski rental business. The magistrate's income figure, by its own terms, did not include any such income. The magistrate found that in 2000 father received an average commission from real estate sales of $5,033.64 per month, or $60,403.68 per year. After deducting business expenses, the magistrate found that father's business income was $4317.26 per month, or $51,804 per year. This figure expressly did not include $14,000 in additional commissions that father anticipated receiving in November and December 2000, nor did it reflect any income that father received from operating the ski shop. The magistrate explained that father had recently opened the ski shop, and he claimed that the business was barely breaking even. The magistrate also noted

---

[1] Father's exhibit 22 covers the period between June 2001 and April 2002 and shows rental payments made during this time. Father also ran the ski shop during the winter of 2000-2001. It is unclear if father paid mother $1298 in commercial rent between December 2000 and May 2001, although it appears that he did not. It is also unclear if father received commercial rent from his business during this period.

that father had not brought any of the books or records for the business to the child-support hearing.

¶ 21. Based on the undisputed evidence presented at the modification hearing, and excluding the $11,074 in depreciation expenses cited by father in his business income statement (which father acknowledges was a paper expense rather than a real cash expense), father's current income appears to exceed $6641 per month or $79,692 per year. Father received approximately $16,000 in profit from the ski rental business between June 2001 and April 2002,[2] or approximately $1444 per month;[3] he received $2727 per month in commercial rent for the Bigelow Drive property; and in 2001, according to his tax return, father made $29,635 in real estate commissions, or approximately $2470 per month. Based on this evidence, the family court committed clear error in finding that father had a monthly income from all sources of approximately $4300. Father had no less income at the time of the modification hearing than he had at the time of the final divorce order; indeed, it appears that he had at least as much or more.[4] Father was receiving

more in commercial rent for the Bigelow Drive property than he received from Mr. Neveu ($2727 per month instead of $1298 per month) and in addition to his real estate commissions, he was making a profit from his ski business of at least $16,000. The family court's modification order is based on erroneous findings as to father's ability to pay, and we therefore reverse its order.

*Affirmed in part, and reversed in part.*

¶ 22. **Skoglund, J.,** dissenting. I write to express my disagreement with the majority's decision to reverse the family court's judgment on spousal maintenance. My disagreement stems from the majority's application of the wrong standard of review. The decision at issue here is a discretionary one that does not require the kind of mathematical exactitude that the majority demands. I would affirm the family court's judgment because the record firmly supports its decision to modify father's spousal maintenance obligation.

¶ 23. An erroneous ruling by the trial court has never been enough to justify reversal of a judgment in this Court. Reversal is permissible only when the claimed error is not harmless. V.R.C.P. 61; see V.R.F.P. 4(a)(1) (making the harmless error standard in V.R.C.P. 61 applicable to divorce proceedings in family court). In the case of spousal maintenance decisions, *reversible* error occurs when the family court's decision lacks any reasonable support in the record. *Stickney v. Stickney*, 170 Vt. 547, 549, 742 A.2d 1228, 1231 (1999) (mem.); *Delozier v. Delozier*, 161 Vt. 377, 381, 640 A.2d 55, 57 (1994). Therefore, clearly erroneous findings may be set aside on appeal, but they do not necessarily require reversal if the judgment has other support in the record. See, e.g., *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) (affirming a family court decision notwithstanding clearly erroneous findings

---

[2] Presumably, these figures should be adjusted to reflect profits over a twelve-month period rather than the eleven-month period reflected on father's exhibit.

[3] Father did not provide an accounting for his business profits from the ski rental business between December 2000 and May 2001, although his corporate tax return for the period between June 2000 and May 2001 indicates that the business had gross income of $69,121.

[4] We note that in calculating husband's maintenance obligation the final divorce order contemplated that the promissory note payments from Mr. Neveu would end in November 2000.

where other supported findings were sufficient to sustain the judgment). Mother, the appellant here, has not demonstrated that the family court's decision to modify father's maintenance obligation has no reasonable support in the record. Therefore, no grounds to reverse exist.

¶ 24. The family court may modify an award of spousal maintenance upon a showing of real, unanticipated, and substantial change in circumstances. 15 V.S.A. § 758; *Taylor v. Taylor*, 175 Vt. 32, 36, 819 A.2d 684, 688 (2002). The threshold change-of-circumstances determination, like the determination on the merits of modification, is discretionary. *Taylor*, 175 Vt. at 36, 819 A.2d at 688. When addressing the change-of-circumstances requirement, the family court should consider both the parties' circumstances at the time of the final divorce and their present circumstances. *Gil v. Gil*, 151 Vt. 598, 599, 563 A.2d 624, 625 (1989).

¶ 25. In this case, the family court found that mother's circumstances had changed since the final divorce order. The court explained that it based the original spousal maintenance award on recognition of mother's role as "primary care giver for the children, the amount of time she was out of the job market, [and] the need to maintain stability for the children by remaining in Vermont." The court found that the parties' income had declined during the course of the marriage and they had accumulated substantial debt. Mother, the court found, "could not afford to not seek employment" after the divorce. The court's stated goal in awarding rehabilitative maintenance was to give mother sufficient time to acquire job skills. Notwithstanding the reality that mother would need to find post-divorce employment, the court found no evidence that mother had done anything toward obtaining skills or employment before moving from Vermont to Connecticut.

¶ 26. On the issue of mother's financial circumstances, the family court found that there was no evidence that mother had any expenses now that she lives in Connecticut with her mother. She does not pay any rent and does not contribute to the household expenses. Mother testified that she receives income — nearly $20,000 in a lump-sum payment — from renting her home in Killington, Vermont. The court found that she could continue to rent the home because she had no intention of moving back to live in it, and, although she has over $100,000 in equity in the home, mother does not plan to sell it. Notably, the court also found that mother's unanticipated move caused father to incur an additional monthly expense of $350 for travel to see the children. The court concluded that mother's "relocation, her continuing inability to obtain some type of salary income, her decrease in expenses, and access to a job market that should provide her with more opportunity [amounted to] a real, substantial, and unanticipated change of circumstances ... since the issuance of the Final Order." In focusing solely on the family court's findings of father's income, the majority's decision overlooks this well-supported analysis of changed circumstances.[5]

¶ 27. The family court's decision on whether and how much to alter father's spousal support obligation is similarly supported by the record. The majority's criticism of the family court's analysis of the evidence on father's income amounts to appellate fact finding. The majority's decision reviews the evidence and finds that father's present annual income is

---

[5] The majority's opinion does not make clear whether it is reversing the change-of-circumstances determination, the decision on the merits of modification, or both.

approximately $79,692. It was the family court, however, that heard the parties' testimony on the financial exhibits in evidence, and it was up to that court, not this one, to assess the credibility and weight of the evidence before it. *LaMoria v. LaMoria*, 171 Vt. 559, 561, 762 A.2d 1233, 1236 (2000) (mem.). There are other ways to view the evidence that the parties presented to the family court.

¶ 28. The family court had several exhibits before it relating to father's income at different points in time since the final divorce. Father's year 2000 federal tax return showed a gross income of $53,717. His 2001 tax return was not in evidence, however. For calendar year 2001, father earned $29,500 in real estate commissions according to his federal 1099 tax form. According to cancelled checks and bank statements from father's ski business, father paid himself $15,400 in rent in calendar year 2001, not $30,000 as the majority finds. The $30,000 figure the majority cites comes from a single exhibit purporting to show the income earned by the ski business for the eleven month period ending April 30, 2002. Father testified, however, that he does not collect rent all year long and that he pays the business's overhead from the rent when the ski shop closes after the ski season. Between father's 2001 real estate commissions and the rental income from the ski business, the evidence establishes that father earned a total of approximately $44,500 in calendar year 2001 — the most recent and complete year of financial information relating to father in the record.

¶ 29. The majority opinion arrives at a much higher annual income by combining income received during different and sometimes overlapping time periods.[6] In

doing so, the majority makes assumptions from the evidence about father's earnings that the family court was not willing to make. In addition, the majority's findings on father's income include $16,000 in "profit" from the ski business.[7] Father testified, however, that his only real profit from the business was the rental income he paid himself. It is not clear from the record evidence that father reaped a meaningful financial benefit from the ski business over and above the rental payments he made. The business's federal tax return for the tax year beginning June 1, 2000 and ending May 31, 2001 shows taxable income or profit of $12,664. That figure is less than the $16,000 in "profit" the majority cites, relying on the eleventh-month income statement ending April 2002.[8] But even

---

real estate commissions, profit the ski business earned from June 2001 to April 2002, plus rental income purportedly collected from June 2001 through April 2002.

[7] The majority refers to the depreciation expense on the business's income statement as a "paper expense" that does not reflect cash, suggesting that father has additional cash available to him. Depreciation is a real expense normally included in a business's income statement even if it does not represent actual cash outlays. D. Martin, Attorney's Handbook of Accounting, Auditing and Financial Reporting ¶ 4.05[1][a], at 4-23 to -24 (4th ed. 2003). It reflects the cost of goods sold where a portion of the cost is determined to benefit future years. *Id.* ¶ 4.04[1], at 4-18.

[8] It is unclear from the record whether father personally realized the profit from the ski rental business. As the Financial Accounting Standards Board has noted, the relation between profit of a business and compensation received by the busi-

---

[6] The majority's findings on father's income rely on the 2001 calendar year

assuming that father earned $16,000 in profit in calendar year 2001, the record shows that, at most, father earned $60,000 or $5000 per month in 2001.

¶ 30. The family court attempted to sort out the financial information and ultimately concluded that "[f]or the purposes of child support and for [the order on modification], [father's] income from all sources is determined at $4,300 per month." Contrary to the majority's characterization otherwise, the family court did not find that father's income was, in fact, $4,300. Rather, the court used that figure as a proxy considering the confusing state of the financial evidence before it, and the magistrate's findings on father's income were never appealed. I cannot conclude as the majority does that the family court's approach to calculating the maintenance due mother exceeded the court's broad discretion in this area.

¶ 31. The mathematical precision the majority's decision requires has no basis in the spousal maintenance statute or our cases interpreting it. Unlike child support, spousal support calculations and their components are not legislatively prescribed. Compare 15 V.S.A. § 752(b) (setting forth nonexhaustive list of relevant factors for family court to consider when establishing the amount and duration of spousal maintenance) with *id.* §§ 650-657 (defining elements and

_____

ness's owners "is complex and often indirect." FASB, Statement of Financial Accounting Concepts No. 6, ¶ 16 (Dec. 1985). "Profitable operations generate resources that can be distributed to owners or reinvested in the enterprise . . . ." *Id.* Father testified that he used the rental payments from the business to pay for fixed expenses during the off season. The record lacks testimony as to how and if father paid himself the profit the majority attributes to him.

method of child support calculation), and *Chaker v. Chaker*, 155 Vt. 20, 25, 581 A.2d 737, 740 (1990) (interpreting the nonexclusive factors in 15 V.S.A. § 752(b) and noting that maintenance award would stand on appeal unless no reasonable basis exists to support it) with *Grimes v. Grimes*, 159 Vt. 399, 406, 621 A.2d 211, 215 (1992) (explaining that the child support guideline system presumes that the support award will be based on the guideline calculation absent finding of inequity). Moreover, this Court has cautioned that it is rarely acceptable to base a maintenance award solely on the obligor's income. *Delozier*, 161 Vt. at 385, 640 A.2d at 59. The majority's preoccupation with the family court's findings on father's income is unwarranted given our prior holdings on spousal maintenance awards.

¶ 32. For the foregoing reasons, I must respectfully dissent from the majority's decision to reverse the family court's judgment on father's spousal maintenance obligation.