**Edward J. BRADY, et al. v. Howard DEAN, et al.**

[790 A.2d 428]

No. 00-547

---

December 26, 2001. Plaintiffs appeal from a superior court order dismissing their challenge to the civil union law enacted by the Legislature in response to this Court's decision in *Baker v. State*, 170 Vt. 194, 744 A.2d 864 (1999). Plaintiffs contend the trial court erred in concluding that they lacked standing and failed to state a claim on which relief could be granted. We affirm.

On April 26, 2000, the Governor signed into law Act 91, "An Act Relating to Civil Unions." 1999, No. 91 (Adj. Sess.). Shortly before its effective date of July 1, 2000, plaintiffs — a group comprised of Vermont taxpayers, members of the Vermont House of Representatives, and three Vermont town clerks — brought this action against the Governor and other state officials, seeking to enjoin the implementation of the law. The taxpayer and legislator plaintiffs asserted a number of claims based on the allegation — which we accept as true for purposes of review, see *Schievella v. Department of Taxes*, 171 Vt. 591, 591, 765 A.2d 479, 480 (2000) (mem.) — that fourteen members of the House of Representatives participated in a "dollar-a-guess" betting pool in connection with a preliminary vote on the civil unions bill. The money went to the participant coming closest to predicting the number of "yes" votes. The vote was seventy-six to sixty-nine in favor of having the bill read a third time. All fourteen participants in the pool voted "yes." Following the vote, Representative Doran Metzger brought the betting pool to the attention of the Speaker. Representative Metzger stated that he was "appalled" and "ashamed" by the conduct of the participants and "concerned [about] the impact on the final vote," but otherwise interposed no objection, challenge or other motion addressing the participants' vote or asking to conduct a revote. Although the Speaker later expressed disapproval of the betting pool, he did not take any action to disqualify the participants, and none undertook to disqualify themselves.

Plaintiffs asserted in their complaint that the Speaker erred in failing to disqualify the fourteen betting-pool par-

ticipants, in violation of a House Rule which provides that "[m]embers shall not be permitted to vote upon any question in which they are immediately or directly interested." Plaintiffs also claimed that by voting on the bill, the betting-pool participants violated various provisions of the Vermont Constitution, including Chapter I, Article 6, which provides that all power is "derived from the people" and that government officials are therefore "accountable to them," Chapter I, Article 7, which provides that government is "instituted for the common benefit, protection, and security of the people, nation, or community," Chapter II, § 12, which states that no member of the General Assembly may "receive any fee or reward" for bringing forward or advocating any bill, and Chapter II, § 61, which prohibits public officers from "tak[ing] greater fees than the law allows," as well as several statutory provisions, including 13 V.S.A. §§ 2101, 2141, and 2151, which criminalize the running of lotteries, games of chance and bookmaking.

The three town clerks raised a separate claim, asserting that their obligation under the civil union law to either issue a civil union license or to appoint an assistant to do so, see 18 V.S.A. § 5161, contravened their sincerely held religious beliefs, in violation of their right to the free exercise of religion under Chapter I, Article 3 of the Vermont Constitution.

The trial court (Judge Martin) denied plaintiffs' initial and renewed requests for a preliminary injunction. Thereafter, the court (Judge Katz) granted defendants' motion to dismiss, ruling that plaintiffs lacked standing, and that even if they had standing the claims failed on their merits. As to the constitutional and statutory claims raised by the taxpayer and legislator plaintiffs, the court found that they presented a "nonjusticiable political question," observing that judicial intervention to disqualify the betting-pool participants retroactively and to invalidate the law "would intrude on the separation of powers and subvert rather than enforce legislative procedure." With respect to the claims of the town clerks, the court ruled that any alleged injury was "too remote and abstract to support standing," and further concluded that, as public officials, the clerks were not constitutionally entitled to "become a law unto themselves and hold the State's neutral and generally applicable laws hostage to [their] beliefs." Accordingly, the court also concluded that the town clerks had failed to state a claim on which relief could be granted and dismissed the complaint. This appeal followed.

I.

The doctrine of standing, although often amorphous in the abstract, represents a core constitutional and prudential commitment to judicial restraint. Courts and commentators have long recognized that, as one author recently observed, "[s]tanding and the separation of powers doctrine [are] wedded together." Note, *The New Law of Legislative Standing*, 54 Stan. L. Rev. 205, 207 (2001). Drawing on well established federal precedents construing the case-or-controversy requirement of Article III of the United States Constitution, this Court has explained the standing doctrine as follows:

> Article III embodies various doctrines, including standing, mootness, ripeness and political question, that help define and limit the role of courts in a democratic society. . . . One of the "passive virtues" of the standing doctrine is to promote judicial restraint by limiting the occasions for judicial intervention into the political process. See generally A. Bickel, *The Least Dangerous Branch* 111-98 (2d ed. Yale Univ. Press 1986) (1962). Standing doctrine

is fundamentally rooted in *respect for the separation of powers of the independent branches of government.*

*Hinesburg Sand & Gravel Co. v. State,* 166 Vt. 337, 340-41, 693 A.2d 1045, 1047-48 (1997) (emphasis added).

Elaborating on the circumstances in which courts should refrain from intervening in cases that present political questions more suitable for legislative or executive resolution, the United States Supreme Court in the seminal case of *Baker v. Carr,* 369 U.S. 186, 217 (1962), observed:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

The prudent exercise of judicial self-restraint and deference to the independence of a coordinate governmental branch is compelled by the facts and circumstances of this case. Our state constitution, in defining the powers of the House of Representatives, expressly provides that the members shall "judge of the elections and qualifications of their own members." Vt. Const., ch. II, § 14. This and numerous other state courts have held that where the state legislature

is made the judge of the qualifications of its members by a provision of the state constitution, the legislature has the sole authority to do so, and courts must refrain from interfering in that determination. See *Kennedy v. Chittenden,* 142 Vt. 397, 399-400, 457 A.2d 626, 627 (1983) (the Constitution "places the final determination of the election and qualifications of its members exclusively in the House of Representatives," rendering any attempted judicial intervention ineffective and violative of separation of powers); see generally *State ex rel. Turner v. Scott,* 269 N.W.2d 828, 831 (Iowa 1978) (collecting state court decisions declining to review legislative determination of members' qualifications); *In re Jones,* 476 A.2d 1287, 1291-92 (Pa. 1984) (noting extensive body of case law vesting exclusive responsibility in legislative body to determine members' qualifications).

Although our constitution does not define, nor have we previously addressed, the precise scope of the legislative prerogative over members' "qualifications," we note that at least one state court has held that the disqualification of legislators for having a personal interest in a proposed bill falls within the constitutional "power of each house of the legislature to judge the qualifications of its own members." *Melland v. Johanneson,* 160 N.W.2d 107, 116 (N.D. 1968). We believe, similarly, that the Vermont House of Representative's exclusive constitutional prerogative to "judge of the qualifications of its members" encompasses the authority to determine whether a member's personal or pecuniary interest requires *dis*qualification from voting on a question before it. Indeed, the House has adopted rules addressed to this very problem.

House Rule 75 provides that "[m]embers shall not be permitted to vote upon any question in which they are immediately or directly interested." House Rule 75. Additional rules in Mason's

Manual of Legislative Procedure, adopted by reference through House Rule 88, instruct that the conflict of interest provision "is obviously not self-enforcing and unless the vote is challenged members may vote as they choose." Mason's Manual of Legislative Procedure § 522(1). Thus, a legislative procedure was readily available to challenge the civil union vote on the grounds that fourteen House members had a disqualifying personal interest in the outcome. Whether an adequate objection on this basis was raised by Representative Metzger, or whether the Speaker adequately responded to his concerns, are matters constitutionally entrusted to the sound and exclusive judgment of the House, not to this Court.

We further conclude that, as a policy matter, a proper regard for the independence of the Legislature requires that we respect its members' personal judgments concerning their participation in matters before them. See *Baker*, 369 U.S. at 217 (finding of nonjusticiability may reflect difficulty of "undertaking independent resolution without expressing lack of the respect due coordinate branches"). Although the separation of powers doctrine does not, to be sure, "contemplate an absolute division of authority among the three branches," *In re D.L.*, 164 Vt. 223, 228, 669 A.2d 1172, 1176 (1995), it does ensure, at a minimum, that no branch will usurp the "core functions," *State v. Pierce*, 163 Vt. 192, 197, 657 A.2d 192, 195 (1995), or impair the "independent institutional integrity" of another. *D.L.*, 164 Vt. at 229, 669 A.2d at 1176. A member's decision to vote on a matter before the House represents, in our view, a core legislative function that must remain inviolate to ensure the continued integrity and independence of that institution.

This is not, of course, to hold that all potential conflicts of interest of state legislators are immune from every form of executive or judicial oversight. Senate and House members may be criminally prosecuted for certain actions, such as soliciting or accepting bribes, see 13 V.S.A. § 1102, or even subject to civil suit for actions outside the scope of their legislative duties. See *United States v. Brewster*, 408 U.S. 501, 526 (1972) ("Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act."); *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979) (allowing defamation action against legislator for acts outside the "legislative function or the deliberations that make up the legislative process"). Nor is it to conclude that courts may not interpret the Constitution in the first instance to determine whether and to what extent an issue is committed to the legislative branch. See, e.g., *Powell v. McCormack*, 395 U.S. 486, 518-22 (1969) (political question doctrine did not preclude Supreme Court from interpreting federal constitution to hold that age, citizenship and residence qualifications expressly prescribed by Constitution were exclusive, and therefore Congress lacked authority to prescribe additional requirements). It is simply to recognize that a representative's decision to vote on a matter before the House is a core legislative function which this Court — as a constitutional and prudential matter — will not scrutinize.

The several conflict-of-interest cases on which plaintiffs rely all involved elected officials of political subdivisions such as cities and towns which do not raise similar separation-of-power concerns. *Coleman v. Miller*, 307 U.S. 433 (1939), on which plaintiffs also substantially rely, is equally unavailing. There the Supreme Court held that twenty state senators from Kansas had standing to challenge the constitutionality of a vote on a proposed amendment to the United States Constitution based on their claim that a tie-breaking vote cast by the state's lieutenant governor did not represent a ratification by the state

"Legislature," as required by Article V of the United States Constitution. As the Supreme Court more recently explained in *Raines v. Byrd*, 521 U.S. 811, 823 (1997) (holding that members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act), *Coleman* stands "at most" for the narrow proposition that legislators whose votes would have been sufficient to defeat or enact a bill have standing to sue if their votes "have been completely nullified" in contravention of a discrete constitutional provision which, correctly applied, would have specifically invalidated the vote. Plaintiffs do not, and cannot, claim here that their votes were "completely nullified" by virtue of the civil unions bill having been deemed enacted in direct contravention of a discrete constitutional provision, as in *Coleman*.

Our conclusion that the issue before us presents a nonjusticiable political question bars the plaintiff taxpayers' challenge to the vote on the civil union bill as effectively as it does the plaintiff legislators. Accordingly, we conclude that the trial court correctly dismissed their claims.

## II.

The town clerks raised a different challenge to the civil unions law, asserting that their obligation under the law to issue a civil union license, or to appoint an assistant to do so, violates their sincerely held religious beliefs under Article 3 of the Vermont Constitution. The parties dispute, at the threshold, the standard to be applied in evaluating this claim. Plaintiffs note that we have traditionally applied a balancing test drawn from a long line of United States Supreme Court decisions, which asks whether an interference with a sincerely held religious belief serves a compelling governmental interest and is narrowly tailored to serve that interest. See *Lyng v. Northwest Indian Cemetery Protective*

*Ass'n*, 485 U.S. 439, 447 (1988); *State v. DeLaBruere*, 154 Vt. 237, 249, 577 A.2d 254, 261 (1990). Defendants urge that we apply the modified test adopted by the United States Supreme Court in *Employment Division, Department of Human Resources v. Smith*, 494 U.S 872, 879 (1990), under which a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.

We need not resolve this particular issue. For even under the more stringent pre-*Smith* test urged by plaintiffs, "we must first make the threshold determination of whether [the law] substantially burdens [their] sincerely held beliefs." *Hunt v. Hunt*, 162 Vt. 423, 432, 648 A.2d 843, 850 (1994); see also *Hernandez v. Comm'r of I.R.S.*, 490 U.S. 680, 699 (1989) (to trigger analysis of state's justification of law, interference with free exercise must at least rise to level of "substantial burden"). An accommodation of plaintiffs' beliefs is not required if the burden on religion is not considered substantial. See, e.g., *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384-92 (1990); *Hernandez*, 490 U.S. at 699; see also L. Tribe, American Constitutional Law § 14-12, at 1248 (2d ed. 1988) ("sincerity and centrality do not always suffice to meet a claimant's required showing; the claimant must also demonstrate a significant burden"). We believe that plaintiffs in this case have failed to make this threshold showing.

In deciding this issue, we accept for purposes of analysis the highly questionable proposition that a public official — here a town clerk — can retain public office while refusing to perform a generally applicable duty of that office on religious grounds. We observe, however, that this proposition — which means that the personal religious beliefs of a public officer may in some circumstances trump the public's right to have that officer's

duties performed — is neither self-evident nor supported by any of the cases cited by plaintiffs.

We also accept at face value plaintiffs' allegation that the act of issuing a civil union license, or even of appointing a substitute for that purpose, offends their sincerely held religious beliefs. See *Thomas v. Review Bd., Ind. Empl. Sec. Div.*, 450 U.S. 707, 714-16 (1981) (all that is necessary to establish the required sincerity is "an honest conviction" that one's religion prohibits the conduct required by law); *Hunt*, 162 Vt. at 432-33, 648 A.2d at 851 ("matters of faith 'need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection'") (quoting *Thomas*, 450 U.S. at 714). We also recognize that courts must be cautious in judging the "centrality" or relative importance of a particular religious practice to a particular faith. *Smith*, 494 U.S. at 887. It is well settled, nevertheless, that "some inquiry" into the threshold requirement of a substantial burden, i.e., the extent to which the government's requirement will make the believer's religious duties "more difficult or more costly," Tribe, *supra*, at 1247-48, is essential to ensure that the neutral laws do not become virtually captive to any declaration of a sincerely held religious belief, however slight the burden. "[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972).

In this regard, numerous decisions have indicated that a burden on religion is not substantial if, as one court observed, "one can avoid it without violating one's religious beliefs." *Smith v. Fair Employment & Hous. Comm'n*, 913 P.2d 909, 926 (Cal. 1996); see also *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985) ("It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights."). Here, the civil union law itself provides the means of avoiding any potential free exercise burden on town clerks, by expressly providing that "[a]n assistant town clerk may perform the duties of a town clerk under this chapter." 18 V.S.A. § 5161(b). Thus, the law itself offers an "accommodation" for town clerks with religious reservations about issuing a civil union license. Plaintiffs assert that even the act of appointing an assistant clerk to issue a license violates their sincerely held religious beliefs. We do not believe, however, that such an indirect and attenuated connection to the subject of the law substantially burdens plaintiffs' rights to freely exercise their religion in any degree approaching constitutional significance. See, e.g., *Curtis v. School Committee of Falmouth*, 652 N.E.2d 580, 587-89 (Mass. 1995) (availability of, or exposure to, condom distribution program in public schools did not substantially burden objecting parents' or students' free exercise rights "to any degree approaching constitutional dimensions"). Therefore, we hold the trial court correctly concluded that plaintiff town clerks failed to allege facts sufficient to state a claim on which relief could be granted.

*Affirmed.*