2006 VT 98

**OFFICE OF CHILD SUPPORT, ex rel. Neil Stanzione v. Joyce STANZIONE**

[910 A.2d 882]

No. 04-426

¶ 1. September 13, 2006. Joyce Stanzione appeals a family court order revoking her driver's license for failure to pay child support arrears. She argues that the trial court erred in three ways: (1) in finding that she had the ability to pay; (2) in ordering the license suspension when it will not produce payment and infringes upon her free exercise of religion; and (3) in denying her motion to continue. We affirm.

¶ 2. Joyce and Neil Stanzione are parents to five children, and the entire family lived at one time in the Twelve Tribes Community. When the parties separated in March 1990, father and parties' three sons left the Community while mother remained with their two daughters. In April 1991, father assigned his child support rights to the State of Vermont as a condition of receiving public assistance for the three minor children living with him. The Office of Child Support (OCS) intervened in October of 1991 and mother was ordered to pay $50 in child support and $12.50 in arrears payments per month. In 1995, one of the daughters left the Community and joined father and her three brothers. Father filed for divorce in 1997, and mother again was ordered to pay $50 per month in child support and $12.50 in arrears payments. The parties were divorced on February 12, 1998. Mother did not appeal either order, and has never made any support payments. On July 31, 1999, the last child in the family attained majority.

¶ 3. In 2001, OCS petitioned to enforce the order, and the court issued an ar-

rears-only enforcement order on February 13, 2002, reducing the arrears to a judgment of $4800 and ordering payment to OCS in the sum of $62.50 per month. The magistrate found that at all times since the initial 1991 order mother had been a member of the Community, "a religious group in which the members live together and share all things in common. As a member of the Community, her needs (food, shelter, etc.) are met by the other members, and mother devotes her efforts to meeting the needs of the Community by providing care to the children of the Community, cooking, and taking care of other members." The magistrate found that mother was healthy, a high school graduate, fifty-one years old, and had not worked outside the Community since she joined in 1983. The magistrate also noted, "[a]s a member of the Community, mother receives a pro rata share in the income that the Community generates. Her share in 2000 was $4889. Her share in 2001 will not exceed $5000. (The Community is a recognized religious non-profit corporation which pays taxes and meets all other obligations to the State.)" The magistrate entered judgment in favor of OCS in the amount of $4800, but declined to award a civil penalty.

¶ 4. On January 2, 2003, OCS again petitioned to enforce the arrears order and also to suspend mother's driver's license pursuant to 15 V.S.A. § 798(b) because mother had made no payments on the $4800 arrears judgment. A notice of the February 26, 2003, hearing was generated on January 13, 2003, and the docket entries note that service was complete on January 21, although it was signed by another person. The week prior to the hearing, mother moved to dismiss and to stay further enforcement of arrears on the grounds that she is a member of the Community, the children had attained majority, she was in ill health, had not competed in the job market for twenty years, and the remedy requested by OCS would unconstitutionally restrict the free exercise of her religion. In the alternative, mother moved to continue the hearing because illness prevented her from returning to Vermont from Florida for the February 26 hearing. The magistrate denied all three motions.

¶ 5. Mother failed to attend the February 26 hearing, and the magistrate granted OCS's petition on that date. The magistrate ruled that although service had been inadequate, mother's three motions filed with the court demonstrated that she had received notice and knowledge of the hearing based upon which the court made findings of actual knowledge and notice. The magistrate also found that mother had the ability to comply with the child support order, and, based on father's uncontested testimony, that mother can serve the church in ways not requiring an operator's license, that the suspension was not an unreasonable restriction on her religious freedom and was the least restrictive remedy available. The order provided that mother could move to reinstate her license upon a lump sum payment of $750 and six continuous monthly payments of $62.50 each. On March 27, 2003, mother filed a V.R.C.P. 59 motion for reconsideration and for further relief, stating she wished to present evidence of hardship and restriction on her religious freedom. The magistrate denied the motions, ruling that all issues could have been raised at the hearing date which mother failed to attend. Mother appealed the magistrate's decision to the family court on March 28, 2003. That court affirmed all of the magistrate's rulings, and this appeal followed.

¶ 6. Mother challenges the magistrate's determination of her ability to pay. Inability to pay is a statutory defense to a license suspension, and the noncomplying party has the burden to demonstrate inability to comply with an order to pay. 15 V.S.A. § 798(a). We re-

view a civil sanction determination such as a license suspension for clear error. *Mayo v. Mayo*, 173 Vt. 459, 462, 786 A.2d 401, 406 (2001) (mem.) (review of contempt finding is for clear error). We will not disturb the judgment on appeal, then, "unless the court's discretion was entirely withheld or was exercised on grounds clearly untenable." *Id.* (citation omitted). We will not set aside findings of fact unless clearly erroneous, and we review them in the "light most favorable to the prevailing party, disregarding modifying evidence, with the burden on the appellant to show that there is no credible evidence to support the findings." *Id.*

¶ 7. Although the February 2003 license suspension order does not contain specific findings regarding mother's ability to pay, at the hearing the magistrate referenced the findings in the February 2002 enforcement order. In the 2002 order, the magistrate addressed mother's membership in the Community, her pro rata share of the Community's income, and her age, health, and education level.

¶ 8. Mother does not dispute those findings as erroneous; instead, she contends that, lacking actual personal income, she has no ability to pay. Where an obligor claims financial inability to pay, the court must find a present ability before imposing a civil sanction. *Hunt v. Hunt*, 162 Vt. 423, 436, 648 A.2d 843, 853 (1994). The magistrate found, within the exercise of her discretion, a present ability to pay based on mother's pro rata share of the Community income and her age, health, and education. This is in accord with the definition of "available income" in our child custody and support statute. 15 V.S.A. § 653. The Legislature has defined "available income" as "gross income" — with deductions not applicable under these facts — and "gross income," in turn, as "expense reimbursements or in-kind payments received by a parent in the course of employment . . . if they reduce personal living expenses." *Id.* § 653(1), (5)(A)(i)-(ii). "Gross income" also includes, under the statute, "the potential income of a parent who is voluntarily unemployed or underemployed." *Id.* § 653(5)(A)(iii). Mother failed to meet her burden to prove inability to pay. She is not "powerless" to comply with the order; instead, she "refuses to abide by [it]." *Mayo*, 173 Vt. at 462, 786 A.2d at 406. We find no abuse of discretion.

¶ 9. Our decision in *Lambert v. Beede* does not compel a different result. 2003 VT 75, ¶¶ 8-9, 175 Vt. 610, 830 A.2d 133 (mem.). There, father's inability to pay due to physical disability was undisputed; the issue was whether an obligor "with an inability to pay can be denied reinstatement of his license under § 798(c)." *Id.* ¶ 9; see 15 V.S.A. § 653(5)(A)(iii)(I) (excluding from "available income" the potential income of a parent who is physically or mentally disabled). Father had become disabled subsequent to the license suspension and, in recognition of his resultant inability to pay, the magistrate reduced both the child support and arrearage orders to $0 per month yet refused to reinstate his driver's license because of father's lack of "good faith" efforts of payment prior to onset of his disability. We held that § 798(c) necessarily includes an inability-to-pay defense and so reversed the magistrate's order denying reinstatement because it "improperly transform[ed] a measure designed to coerce payment into a punitive device." *Lambert*, 2003 VT 75, ¶ 1. "[C]ivil sanctions aim to compel compliance rather than to punish," and the proper tool to determine whether the sanction amounts to coercion rather than punishment is the ability-to-pay analysis. *Id.* ¶ 12. Here, mother has the ability to pay under the statutory definition of "available income," and her claim that there is no reasonable likelihood that the order will coerce her into compliance

does not strip the State of an available enforcement remedy, so long as it does not infringe upon mother's free exercise of her religion.

¶ 10. Because we find the license suspension order otherwise affirmable, we consider whether it impermissibly infringes upon mother's free exercise of her religious beliefs under the federal and state constitutions. Even under the most stringent potential test, we conclude that it does not. See *Brady v. Dean*, 173 Vt. 542, 546, 790 A.2d 428, 433-34 (2001) (mem.) (discussing potential tests under state constitution). Under the strictest test, a state may burden religious liberty if the license suspension advances a compelling governmental interest and the state uses the least restrictive means to advance that interest, but mother must first make a threshold showing that the license suspension is a substantial burden on the free exercise of her sincerely-held religious beliefs. *Hunt*, 162 Vt. at 432, 648 A.2d at 850; *Brady*, 173 Vt. at 546, 790 A.2d at 433-34.[1]

[1] Although we need not decide which test applies to mother's claim, we note that the stringent test has not applied to generally-applicable state laws since 1997. See *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) ("RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance."). See also *Sherbert v. Verner*, 374 U.S. 398, 406-09 (1963) (requiring compelling government interest); *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (requiring, in addition, that the challenged law employ the least restrictive means to achieve the compelling interest); see also Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(b) (purporting to forbid state and federal governments from substantially burdening religious exercise via generally-applicable laws except when

¶ 11. Mother has not made this threshold showing. Mother had notice of the hearing and was absent, and so presented no evidence on this point. The magistrate was instead persuaded by the testimony of father, a former Community member, that mother could exercise her religious beliefs without a driver's license. Mother has not shown that suspending her driver's license would substantially burden her free exercise of religion, and we need not proceed further in the free exercise analysis.

¶ 12. Mother also attempts to challenge the underlying 1997 child support order imposing $50 per month. Mother never appealed that order; this appeal arises from an enforcement action. Accordingly, this claim is out of time. V.R.C.P. 60(b).

¶ 13. Finally, mother argues that the magistrate abused her discretion in refusing to grant a continuance of the license suspension hearing. The denial of a motion to continue will not be reversed absent a clear abuse of discretion, *State v. Stenson*, 169 Vt. 590, 593, 738 A.2d 567, 571 (1999) (mem.), and to support an abuse of discretion claim mother must show that the magistrate either totally withheld her discretion or exercised it on grounds clearly untenable. *Trotier v. Bassett*, 174 Vt. 520, 523, 811 A.2d 166, 170 (2002) (mem.).

¶ 14. Mother argues that the magistrate abused her discretion for several reasons. First, she claims the magistrate

such laws are the least restrictive means to further a compelling government interest). To the extent that *Hunt*, decided as it was during RFRA's brief tenure of application to state laws, depended on the stringent RFRA test, it is inapposite here. 162 Vt. at 431-38, 648 A.2d at 850-54 (holding imposition of child support obligation permissible under RFRA, but holding contempt sanction violative of same).

wrongly dismissed her motion as untimely because although mother did receive actual notice, service was inadequate so the magistrate had no proof of when mother actually received notice. But mother sought a continuance for health reasons, not because of inadequate service, and thus waived this claim. Mother next argues that the magistrate ignored the evidence substantiating her claim that illness limited her ability to travel. The record reveals she had a radiology consultation and a note from a physician acknowledging his treatment of mother, but there is no evidence that mother could not travel. As to other arguments, the fact that OCS did not oppose mother's motion and mother had no history of seeking continuances did not require the magistrate to grant the continuance, nor was the magistrate required to make written findings to support the denial of the continuance. See V.R.C.P. 52(a)(3) (setting forth circumstances when motion decisions require written findings).

¶ 15. Finally, mother charges that she was denied due process because the court did not instruct that she could participate in the hearing by telephone. This argument does not have merit. In *Town of Randolph v. Estate of White*, on which mother relies, this Court held that the town failed to provide adequate notice of a zoning violation and therefore did not satisfy due process when it instructed the defendant to remove violating junk or face fines, but failed to inform him that he could contest the administrator's decision. 166 Vt. 280, 283, 285, 693 A.2d 694, 695, 696-97 (1997). Here, there is no dispute that mother received actual notice of the hearing and that the notice reasonably informed mother of the opportunity to present her objections at that hearing. Any lack of notice regarding participation by telephone as an additional potential opportunity to be heard does not amount to a due process violation, and

does not help mother's claim regarding denial of a continuance. We find no abuse of discretion.

*Affirmed.*

¶ 16. **Dooley, J.**, dissenting. This case is entirely controlled by *Lambert v. Beede*, 2003 VT 75, 175 Vt. 610, 830 A.2d 133 (mem.), and the suspension of mother's operator's license should be reversed because of her inability to pay the child support arrearage. While I agree that the magistrate acted within her discretion in denying the motion to continue, the record before her conclusively showed inability to pay.

¶ 17. Under the child support enforcement statute, a current inability to pay is a complete defense to a license suspension to enforce child support orders. 15 V.S.A. § 798(a) ("An inability to comply shall be a defense in an action brought under this subsection."). We summarized the applicable law in *Lambert*:

> Although the payment of child support is a serious obligation, the state enforces payment orders against noncompliants through various civil rather than criminal sanctions. . . . To avoid qualifying as punishment, a civil sanction such as license suspension "must be capable of being avoided by defendants through adherence to the court's order." *Sheehan v. Ryea*, 171 Vt. 511, 512, 757 A.2d 467, 468 (2000) (mem.); see also *Russell v. Armitage*, 166 Vt. 392, 399, 697 A.2d 630, 635 (1997) (citing ability to comply as one of three issues requiring consideration in every hearing regarding civil contempt for failure to pay child support).

> In contrast to criminal sanctions, civil sanctions aim to compel compliance rather than

to punish those in contempt. A court must therefore consider a child support debtor's ability to pay before imposing a civil sanction. *Sheehan*, 171 Vt. at 512-13, 757 A.2d at 468-69 (declaring incarceration an improper sanction for an individual in contempt of child support obligations who does not have the ability to pay these obligations); *Spabile v. Hunt*, 134 Vt. 332, 335-36, 360 A.2d 51, 52-53 (1976) (sanction for noncompliance with child support payments inappropriate where it does not contain any findings as to the husband's ability to meet his court-decreed obligations); *Andrews v. Andrews*, 134 Vt. 47, 49, 349 A.2d 239, 241 (1975) ("Civil contempt can be found where a party, though able, refuses to comply with a valid, specific court order."). We have also required courts to consider ability to comply before ordering sanctions that are less restrictive than incarceration. *Mayo v. Mayo*, 173 Vt. 459, 463-64, 786 A.2d 401, 407 (2001) (mem.) (rejecting modification of a noncompliant's final divorce order as an inappropriate child support enforcement sanction where evidence did not establish financial ability to make support payments). We must therefore administer § 798(c)'s license suspension provisions consistent with our other civil sanctions, recognizing ability to comply as a prerequisite to enforcement.

The purpose of the child support enforcement statutes is to ensure that children enjoy the "standard of living [they] would have enjoyed had the marriage not been dissolved." 15 V.S.A. § 650 (setting out the purpose of all child support provisions and enforcement measures). Here, where an individual is unable to pay due to an income of only $796 per month in disability benefits and his children have reached the age of majority, the statutory purpose can no longer be satisfied. Along with producing little benefit, upholding the decision below would improperly convert § 798 into a punitive measure, as Beede cannot pay his outstanding arrearage of $29,269.28 or regress in time to make the good faith efforts required of him by the magistrate. If Beede should ever receive an inheritance, or should he win the lottery, 33 V.S.A. §§ 3902(e) and 3903 will ensure that these funds go towards settling his arrearage. In the meantime, Vermont law does not allow the state to continue his license suspension under 15 V.S.A. § 798 as a punishment for his past behavior.

2003 VT 75, ¶¶ 11-13. The majority holds that the requirements of *Lambert* have been met in this case because the magistrate and the family court explicitly found that mother has the ability to pay the outstanding child support arrearage on which the license suspension is based.

¶ 18. I agree that the magistrate checked a box to find that mother has the ability to pay the arrearage, and the family court affirmed. The majority concedes, however, that the license suspension order "does not contain specific findings regarding mother's ability to pay." In fact, there is no evidence to support this conclusion, and the findings are inconsistent with the conclusion. The

magistrate found orally that mother's income is "support through the church but ... she herself receives no wages or other means of income which is subject to any remedy that the court has tried to exercise." This magistrate was also the magistrate in 2002 when OCS last sought enforcement of mother's child support obligation. The magistrate found then:

> At all times since the nominal support was first ordered in 1991, Mother has been a member of the Twelve Tribes Community. The Community is a religious group in which the members live together and share all things in common. As a member of the Community, her needs (food, shelter, etc.) are met by the other members, and Mother devotes her efforts to meeting the needs of the Community by providing care to the children of the Community, cooking, and taking care of other members.

> Mother is physically healthy. She is a high school graduate. She is 51 years old. She has not worked outside the Community since she joined in 1983.

> As a member of the Community, Mother receives a pro rata share in the income that the Community generates. Her share in 2000 was $4889. Her share in 2001 will not exceed $5000.

If the latter finding involved cash to mother, there would be support for the magistrate's conclusion that mother has the ability to pay the child support arrearage. It is undisputed, however, that mother has no actual income *as the magistrate found in this proceeding.* OCS acknowledged this reality in its oral argument to this Court. The pro rata share to which the magistrate referred in 2002 is only the paper value of mother's services as the church reported for tax purposes.[2] That amount was $4,889 per year.

¶ 19. This brings us to the heart of the matter. The majority concludes that mother has the ability to pay "based on mother's pro rata share of the Community income and her age, health, and education." *Ante,* ¶ 8. Specifically, it holds that ability to pay must be determined based on the statutory definition of available income in 15 V.S.A. § 653 to include "in-kind payments" and the "potential income of a parent who is voluntarily unemployed or underemployed." In doing so, the majority has written the ability to pay requirement out of the statute for everyone except welfare recipients.

¶ 20. There is no evidence in this case of the value of the shelter, food and clothing provided in-kind by the Community to mother; the evidence is only a tax calculation of the value of mother's labor as a share of the Community's income. Thus, like the family court, the majority is counting income to the Community as if it were income to mother.

---

[2] The evidence for this finding was mother's testimony. She filed a letter from the treasurer of the church community in connection with her financial disclosure. His letter stated that the pro rata share of the church's income allocated to mother was as found by the magistrate. During the 2002 hearing, the magistrate asked mother "for the year 2000 the pro-rata share of *income of the order* allocated to you was $4,889 and that a schedule K1 was filed with the IRS confirming that amount. Do you agree with the contents of this letter that's what happened?" (Emphasis supplied.) Mother answered "Yes."

¶ 21. More significant, "ability to pay" necessarily involves a determination of net available income unless we are holding that no living expense, including food or shelter, can take priority over paying child support. The evidence is that $4,889 of income was attributed to mother in 2001. That amount is about *60% of the poverty level* for a single person in 2001. 66 Fed. Reg. 10695 (February 16, 2001) (poverty level is $8,590 per year). If we are saying that a person living at well below a subsistence level has the ability to pay based on that income, there is no meaningful ability to pay requirement.[3]

¶ 22. Nor is it an answer that mother is underemployed and the court can impute income to her. The requirement is that there be a "present ability to pay." *Hunt v. Hunt*, 162 Vt. 423, 436, 648 A.2d 843, 853 (1994). No such finding is possible here with respect to an obligor who has no money and no assets that can be turned into money. Nor is there a finding that a fifty-one year old high school graduate, with children, who has worked as a cook and caretaker, can make substantially more money. Finally, the court must find that the underemployment of the parent is not in the best interest of the child, 15 V.S.A. § 653(5)(A)(iii)(III), essentially a value judgment of whether the children are better raised within the religious community or without. There is, of course, no finding on this point; such a finding would inevitably second-guess mother's religious choice.

¶ 23. In essence, the majority has said that the determination of whether there is a child support obligation, determined under the definitions of income in § 653(5), governs whether there is an ability to pay. Since some child support obligation is always imposed, no matter how low the obligor's income, 15. V.S.A. § 656(b), it is tautological that there is always some ability to pay. This analysis is directly contrary to the holding in *Lambert*, which held that the obligor was unable to pay *as a matter of law* because he had "an income of only $796 per month in disability benefits." 2003 VT 75, ¶ 13. Thus, under *Lambert*, where the obligor had an income almost twice that attributed to mother in this case, the ability to pay was determined by the amount of the income. Nowhere does the decision talk about the obligor's inability to earn more income. As I said in the opening of this dissent, *Lambert* should govern here.

¶ 24. Although unsaid directly, the majority's affirmance of the suspension of mother's license rests on its conclusion that mother should be required to leave the Community, reside on her own outside the communal living situation of the Community and earn income independently to pay the child support arrearage. We rejected exactly this result in *Hunt v. Hunt* in relation to a family court holding that a Community resident was in contempt of court for failing to earn money outside the Community to pay child support. 162 Vt. at 437-38, 648 A.2d at 853-54. We held:

> In the contempt hearing, the State offered no evidence that it was pursuing the least restrictive alternative. Essentially, the State sought a harsh sanction in a case of imputed income. At oral argument before this Court, counsel for OCS acknowledged that his office exercises considerable discretion in pursuing delinquent obligors. OCS generally follows up on cases with a "reasonable possi-

---

[3] The holding is even more extreme where the "income" is in-kind receipt of food, clothing and shelter as if these necessities could be sold to produce cash to pay child support.

bility" of successful collection — generally, not delinquent obligors without assets or employment. The State has failed to establish that contempt and jail are the least restrictive means to further the state's compelling interest in enforcing the child support obligation. Contempt and incarceration are not, per se, impermissible infringements on free exercise, and may be imposed provided the State makes the requisite showing as mandated by the Religious Freedom Restoration Act. In this case, however, the State has failed to make this showing, and therefore the contempt order impermissibly burdens defendant's free exercise rights as guaranteed by the federal constitution.

*Id.* at 437-38, 648 A.2d at 854.

¶ 25. A substantial part of the magistrate's hearing in this case was taken up by her asking the OCS representative what alternative to license suspension OCS had pursued. OCS's response was that it had not, and would not, pursue an alternative. Essentially, its position is that license suspension is an alternative to contempt, and OCS can pursue it irrespective of the presence of any other remedy. OCS argued this position at the family court hearing:

> [I]t's also not clear to me that the statute isn't ... or can't be imposed entirely for what amounts to punishment reasons. I — again, this is not civil contempt. No one is going to be jailed and although there is a right ... an interest that a person has in having or obtaining a driver's license it's not the same.

¶ 26. The OCS position, and the majority's acceptance of it, is contrary to our analysis in *Lambert* where we held that we must "administer § 798(c)'s license suspension provisions consistent with our other civil sanctions, recognizing ability to comply as a prerequisite to enforcement." 2003 VT 75, ¶ 12. Specifically, we held that license suspension cannot be used as a punishment. *Id.* ¶ 13. The responsibility of OCS to show the absence of an alternative enforcement method should be as strong for license suspension as it is for contempt.

¶ 27. The majority's answer to the conflict between mother's religious practices and the demands upon her to avoid license suspension is that mother can serve the Community without a driver's license. That finding is irrelevant to the basic conflict and reinforces the conclusion that mother must abandon her religious convictions or lose the right to drive an automobile. Under these circumstances, the license suspension is purely a punishment for mother's adherence to her religion. As we held in *Lambert*, § 798 does not authorize using license suspension to punish behavior which the State finds undesirable. *Id.* ¶ 13. This holding is particularly pertinent when that behavior is compelled by religious beliefs.

¶ 28. I dissent from the majority's holding that grounds existed to suspend mother's driver's license. I would reverse.

¶ 29. **Johnson, J.,** dissenting. I join in Justice Dooley's dissent insofar as it demonstrates that the magistrate's determination regarding mother's ability to pay the child support arrearage was clearly erroneous. Even if we were to accept mother's share of the community's tax obligations as the amount of mother's income, it was insufficient to pay the outstanding arrearage. The license suspension did nothing to further the pur-

pose of compelling payment. Indeed, OCS did not expect it to result in payment. As we discussed in *Lambert v. Beede*, the enforcement scheme for child support orders is civil, not criminal. 2003 VT 75, 175 Vt. 610, 830 A.2d 133 (mem.). As such, civil sanctions aim to compel compliance rather than to punish those in contempt. Therefore, the magistrate's order must be supported by a finding of ability to pay before sanctions may be imposed; otherwise, the sanction is purely punitive. Because the magistrate's finding is not supported by the evidence, the lower court's decision must be reversed under *Lambert v. Beede* without further analysis of mother's ability to work outside of her community. I would reverse on this ground.

Motion for reargument denied October 24, 2006.