NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 2

No. 2016-428

| | |
|---|---|
| Representative Donald Turner, Jr. and Senator Joseph Benning | Original Jurisdiction |
| v. | |
| Governor Peter Shumlin | January Term, 2017 |

Deborah T. Bucknam of Bucknam & Black, and Janssen Willhoit, St. Johnsbury, for Petitioners.

William H. Sorrell, Attorney General, William E. Griffin, Chief Assistant Attorney General, and Benjamin D. Battles, Assistant Attorney General, Montpelier, for Respondent.

Daniel P. Richardson and Stephen F. Coteus of Tarrant, Gillies & Richardson, Montpelier, for Amicus Curiae Senator Richard Sears.

PRESENT: Reiber, C.J., Dooley, Skoglund and Eaton, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

¶ 1. **PER CURIAM.** Petitioners, Representative Donald Turner, Jr. and Senator Joseph Benning, seek to enjoin respondent, Governor Peter Shumlin, whose last day in office is January 5, 2017, from appointing a successor to the office held by Associate Justice John Dooley, whose current term expires on April 1, 2017. For the reasons stated below, we conclude that

petitioner Senator Benning has standing to bring this action and that respondent does not have the authority to appoint Justice Dooley's successor.[1]

## I. Facts and Procedural History

¶ 2. The parties have agreed to the following facts. Associate Justice John Dooley was appointed to a six-year term as a justice of this Court on June 12, 1987. The General Assembly voted to retain Justice Dooley for additional six-year terms in 1993, 1999, 2005, and 2011. Justice Dooley did not file a declaration with the Office of the Secretary of State before September 1, 2016 indicating that he would seek retention for another term beyond March 31, 2017, the last day of his current six-year term. See 4 V.S.A. § 4(c) ("A supreme court justice may file in the office of the secretary of state, on or before September 1 of the year preceding the expiration of the term for which he or she was appointed or retained, a declaration that he or she will be a candidate for retention."). He will remain in his office as an associate justice of the Court until April 1, 2017.

¶ 3. Respondent was elected as Governor in 2010, 2012, and 2014. He did not seek reelection in the fall of 2016 for another term as Governor. Phil Scott won the election in November 2016 and will be sworn in as the new Governor on the afternoon of January 5, 2017. The Vermont Legislature will commence its next biennium on January 4, 2017.

¶ 4. Following Justice Dooley's decision not to seek retention for another term, respondent announced his intention to appoint Justice Dooley's successor. The Judicial Nominating Board began its selection process. On December 16, 2016, after completing its review of applicants, the Board transmitted to the Governor a list setting forth the names of six candidates to replace Justice Dooley.

---

[1] Petitioners seek an injunction, but respondent has acknowledged through counsel that he will abide by this Court's decision on the question presented, and thus there is no need for the Court to issue further injunctive relief.

2

¶ 5.     On December 21, 2016, petitioner Donald Turner, Jr., a state representative and Minority Leader of the House of Representatives, filed a petition for quo warranto[2] contesting respondent's authority to appoint Justice Dooley's successor and asking this Court to enjoin him from doing so.  Petitioner Turner asserted that although the Vermont Constitution authorizes the Governor to fill a vacancy on the Court, no vacancy will exist until Justice Dooley leaves office on April 1, 2017, nearly three months after Governor Shumlin leaves the Office of Governor.

¶ 6.     On December 23, 2016, the Office of the Attorney General filed a notice of appearance on behalf of respondent.  That same day, this Court enjoined the Governor from appointing Justice Dooley's successor until further order from this Court, ordered the parties to file memoranda of law on or before December 30, 2016, and scheduled a hearing for January 3, 2017.

¶ 7.     On December 27, 2016, Senator Joseph Benning, who is Senate Minority Leader and Vice-Chair of the Senate Judiciary Committee, filed a motion to intervene in the matter and

---

[2] Quo warranto, Latin for "by what authority," is "[a] common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." Quo Warranto, Black's Law Dictionary (10th ed. 2014).  By rule, this Court has abolished the old writs of certiorari, mandamus, prohibition, and quo warranto and required parties seeking relief that would have been available through those writs to file a petition for extraordinary relief with this Court pursuant to the procedures set forth in Vermont Rule of Appellate Procedure 21.  See V.R.A.P. 21(a)-(b).  Representative Turner failed to comply with the requirement in the rule that the complaint "concisely set forth the reasons why there is no adequate remedy under the rules or by appeal through proceedings for extraordinary relief in the superior court." V.R.A.P. 21(a)(3).  Because of the importance of the issues raised, the short time frame to decide those issues, and the apparent lack of a need for factual development, we suspend the rules for good cause pursuant to Vermont Rule of Appellate Procedure 2 and consider the petition in the first instance, notwithstanding petitioners' failure to comply with the requirement.  See V.R.A.P. 2 (permitting Court to suspend rules of appellate procedure when necessary "to expedite its decision or for other good cause."); see also State v. Saari, 152 Vt. 510, 514-15, 568 A.2d 344, 347 (1989) (suspending Rule 21 provision requiring petitioner to explain why no adequate remedy was available elsewhere "because of the importance of the issue and because no further facts are necessary in order to consider the merits of the issues raised").

join the petition. The following day, this Court granted the motion. Petitioners and respondent filed memoranda of law on December 30, 2016. On that same day, Senator Richard Sears, who is Chair of the Senate Judiciary Committee, submitted an amicus curiae brief in support of respondent's position, along with a motion for permission to file the brief. On January 3, 2017, this Court granted Senator Sears's motion and held a hearing on the petition.

## II. Ripeness and Standing

¶ 8. Before addressing the merits of the petition, we first consider whether the petition is ripe for resolution and whether petitioners have standing to bring this action. "Vermont courts are vested with subject matter jurisdiction only over actual cases or controversies involving litigants with adverse interests." Brod v. Agency of Nat. Res., 2007 VT 87, ¶ 8, 182 Vt. 234, 936 A.2d 1286; see In re Constitutionality of House Bill 88, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) ("The judicial power, as conferred by the Constitution of this State upon this Court, is the same as that given to the Federal Supreme Court by the United States Constitution; that is, the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." (quotation omitted)). Respondent contends that the instant matter is not ripe for judicial resolution because he has not yet nominated a replacement for Justice Dooley and, even if he proceeds with his intent to choose Justice Dooley's successor, there will be no justiciable controversy unless and until the Senate confirms the appointment. We disagree.

¶ 9. A claim is not constitutionally ripe if the claimed injury is conjectural or hypothetical rather than actual or imminent. Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 688-89 (2d Cir. 2013); see also Skaskiw v. Vt. Agency of Agric., 2014 VT 133, ¶ 31, 198 Vt. 187, 112 A.3d 1277 ("Claims are ripe when there is a sufficiently concrete case or controversy, as opposed to one that is abstract or hypothetical." (quotation omitted)); N.Y. Civil Liberties Union

v. Grandeau, 528 F.3d 122, 130 n.8 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." (quotation omitted)). There is nothing conjectural or hypothetical about either respondent's challenged conduct or petitioners' claimed injury. The Governor's pronouncement of his intent to fill a "vacancy" on the Court by naming Justice Dooley's successor is unequivocal, not conjectural or hypothetical—indeed, he is herein vigorously maintaining his right to do so. The agreed statement of facts provides that the Governor is prepared to nominate one of the candidates. Petitioners' claimed injury is that respondent's constitutionally unauthorized appointment interferes with their constitutionally provided legislative responsibilities regarding judicial appointments. As discussed more fully below, petitioners' legislative responsibilities in dispositive part involve a fundamental interest in ensuring that their votes are part of a sound constitutional process. This claim is ripe.

¶ 10. We now turn, more specifically, to the question of standing. "This Court has adopted the constitutional and prudential components of the standing doctrine enunciated by the United States Supreme Court." Schievella v. Dep't of Taxes, 171 Vt. 591, 592, 765 A.2d 479, 481 (2000) (mem.). Standing, among other related doctrines, is rooted in respect for the separation of powers and is aimed at promoting judicial restraint by limiting judicial intervention in a democratic society and in the political process. Brady v. Dean, 173 Vt. 542, 543-44, 790 A.2d 428, 430-31 (2001) (mem.). The "gist of the question of standing" is whether plaintiff's stake in the outcome of the controversy is sufficient "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204 (1962); see also Ariz. State Legislature v. Az. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2663, ___ U.S. ___, ___ (2015) (stating that

5

"standing is one element of the Constitution's case or controversy limitation on federal judiciary authority, expressed in Article III of the Constitution" (quotation omitted)).

¶ 11. To satisfy the threshold requirement of standing, a plaintiff "must present a real—not merely theoretical—controversy involving the threat of actual injury to a protected legal interest rather than merely speculating about the impact of some generalized grievance." Brod, 2007 VT 87, ¶ 9 (quotations omitted). To meet this burden, a plaintiff "must show (1) injury in fact [in the form of an invasion of a legally protected interest], (2) causation, and (3) redressability." Id. (quotation omitted). As a federal district court recently stated in summarizing the test set forth by the U.S. Supreme Court:

> The irreducible constitutional minimum of standing contains three elements: (1) the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Rossito-Canty v. Cuomo, 86 F. Supp. 3d 175, 198 (E.D.N.Y. 2015) (quotations omitted). In considering whether a particular plaintiff has satisfied these elements and thus is entitled to adjudication of the particular claims asserted, a court must ask whether "the injury [is] too abstract, or otherwise not appropriate," to be judicially cognizable, whether "the line of causation between the illegal conduct and injury [is] too attenuated," and whether "the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative." Allen v. Wright, 468 U.S. 737, 752 (1984), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, ___ U.S. ___ (2014).

¶ 12. Although legislators, like other plaintiffs, must satisfy these same elements to demonstrate standing, Markham v. Wolf, 136 A.3d 134, 140 (Pa. 2016), separation of powers and

the limited role of the judiciary compel particular scrutiny in determining whether there is an injury in fact. Russell v. DeJongh, 491 F.3d 130, 133 (3d Cir. 2007); see Raines v. Byrd, 521 U.S. 811, 819-20 (1997) ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.").

¶ 13. Generally, "legislators have a legally protected interest in their right to vote on legislation and other matters committed to the legislature, which is sometimes phrased as an interest in 'maintaining the effectiveness of their votes.' " Russell, 491 F.3d at 134 (quoting Coleman v. Miller, 307 U.S. 433, 438 (1939)). "Not every affront to a legislator's interest in the effectiveness of his [or her] vote . . . is an injury in fact sufficient to confer standing to sue." Id. at 134. But "legislators, as legislators, are granted standing to challenge executive actions when specific powers unique to their functions under the Constitution are diminished or interfered with." Markham, 136 A.3d at 141; see Fumo v. City of Philadelphia, 972 A.2d 487, 501 (Pa. 2009) (stating that while "legislative standing has not been recognized in actions seeking redress for a general grievance about the correctness of governmental conduct," legislators "have been permitted to bring actions based upon their special status where there was a discernible and palpable infringement on their authority as legislators"). Legislative standing, however, is not available "to obtain a result in a courtroom which [a legislator] failed to gain in the halls of the Legislature." Silver v. Pataki, 755 N.E.2d 842, 848 (N.Y. 2001) (quotation omitted); see Wilt v. Beal, 363 A.2d 876, 881 (Pa. Commw. Ct. 1976) (stating that once legislators' votes that "they are entitled to make have been cast and duly counted, their interest as legislators ceases").

¶ 14. Applying these general principles, courts have found legislative standing when a governor's conduct concerning the appointment of state officers interfered with the complaining

7

legislators' constitutional duty to provide advice and consent with regard to the appointments. In Dennis v. Luis, for example, the court held that eight legislators had standing to challenge the governor's appointment of a person as "acting" commissioner after the legislature had rejected the governor's nomination of the same person in the same post. 741 F.2d 628, 630-31 (3d Cir. 1984). The legislators complained that the Governor had circumvented the process of advice and consent, thereby nullifying their votes. The court agreed that the legislators had standing to protect their unique statutory right to provide advice and consent. Id. at 631. The court further found that there were no prudential concerns that would have barred the legislators' suit on standing grounds, given that the legislators could not obtain redress through legislative means. Id. at 633-34.

¶ 15.   In Zemprelli v. Thornburg (Zemprelli I), the court held that a state senator had standing to challenge the governor's failure to appoint certain state officers within the time provided by the state constitution. 407 A.2d 102, 104-06, 110 (Pa. Commw. Ct. 1979). The court based its holding on the senate's constitutional duty to provide advice and consent as to the appointments in question. Id. at 105-06; see also Stroup v. Kapleau, 313 A.2d 237, 239 (Pa. 1973) (holding that state senators had standing to challenge governor's temporary appointments based on senate's constitutional right to confirm or reject such appointments); Zemprelli v. Thornburg (Zemprelli II), 457 A.2d 1326, 1329 (Pa. Commw. Ct. 1983) (holding that state senators  had standing to challenge governor's appointments beyond constitutional time limit because "each state senator has a constitutional duty to vote on executive nominations for appointive offices" and "these senators have a grave stake in assuring that nominations submitted to the Senate will pass constitutional muster"); cf. Skelos v. Paterson, 885 N.Y.S.2d 92, 96 (App. Div.) (holding that state senators had standing to challenge governor's appointment to fill vacancy in office of lieutenant governor because lieutenant governor has tie-breaking vote in senate and has power to rule that

8

senators' remarks on senate floor are not germane), rev'd on other grounds, 915 N.E.2d 1141 (N.Y. 2009).

¶ 16.    With these legal principles in mind, we conclude that Senator Benning has standing to challenge respondent's authority to appoint Justice Dooley's successor.[3]  As a member of the Vermont Senate, Senator Benning has the constitutional right and duty to give "advice and consent" on the Governor's nomination of an Associate Justice to this Court.  Vt. Const. ch. II, § 32.  That right necessarily encompasses an interest in being assured that his vote—pursuant to his constitutional duty to provide "advice and consent" on the Governor's Supreme Court appointments—is exercised with respect to a properly named appointee under the Vermont Constitution.

¶ 17.    In other words, Senator Benning has a particular right and interest in not having his constitutional duty subverted by voting on an appointee who is not constitutionally entitled to hold office in the first instance.  See Zemprelli I, 407 A.2d at 110 (holding that governor's constitutional duty to name appointee "confers a legal interest" on state senator seeking to compel governor to fulfill his or her constitutional duty).  The Senate has a right and an obligation to ensure that its advice and consent is exercised in compliance with the Constitution, and it should not be required to exercise that duty on a patently unconstitutional appointee.  In sum, the interest at stake here is not simply the Senate's vote on the appointee, which it retains regardless of the appointee's qualifications—nor its right to reject the appointee, which it may do—but rather the fundamental interest in ensuring that its vote is part of a sound constitutional process.

---

[3] Given our determination that Senator's Benning's interest is sufficient to confer standing in this action, we need not, and do not, consider whether Representative Turner's interests would also confer standing.

9

¶ 18. In his capacity as a senator, Senator Benning has a stake in assuring that any nomination of an Associate Justice by Governor Shumlin passes constitutional muster. Cf. Lawless v. Jubelirer, 789 A.2d 820, 827 (Pa. Commw. Ct. 2002) (citing legislator's taking of oath to defend state constitution as additional basis to assert standing). Senator Benning's interests, particularly those protected by the Vermont Constitution, are not abstract but rather concrete, particularized, and imminent. Further, there is a direct causal connection between the alleged injury—interference with Senator Benning's legislative authority with respect to the appointments—and the injury complained of—a constitutionally unauthorized appointment. Finally, this Court can provide complete redress for the injury complained of. In short, the alleged injury is not abstract, the causation between the alleged injury and illegal conduct is not too attenuated, and the prospect of obtaining relief is not too speculative.

¶ 19. Moreover, although neither respondent nor amicus curiae have raised the political question doctrine, we conclude that the petition does not create a political question unsuitable for judicial resolution. As quoted in Brady, the U.S. Supreme Court has set forth six factors for addressing such a concern:

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; [or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

173 Vt. at 544, 790 A.2d at 431 (quoting Baker, 369 U.S. at 217).

10

¶ 20. None of these factors apply here. There is no "textually demonstrable constitutional commitment" that the issue raised here be resolved by any branch of government other than the judiciary. Baker, 369 U.S. at 217. Nor is there a lack of judicial standards to resolve the issue. Nor is it impossible for this Court to resolve the issue while giving due respect to the coordinate branches of government and avoiding policy decisions of a kind reserved for nonjudicial discretion. Nor is there "an unusual need for unquestioning adherence to a political decision already made" or any danger of potential "embarrassment from multifarious pronouncements" on the issue. Id. Hence, we discern no basis to refrain from addressing the merits of the petition on political grounds. See id. ("Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.").

¶ 21. As the U.S. Supreme Court has stated, "courts possess power to review either legislative or executive action that transgresses [the] identifiable textual limits [of the Constitution]." Nixon v. United States, 506 U.S. 224, 238 (1993). Not every gubernatorial action is a political question immune from judicial scrutiny, regardless of whether it comports with the Constitution. The issue here is not executive discretion or prerogative, but rather the meaning of the Vermont Constitution, which this Court must determine.

III. Governor Shumlin's Authority To Fill the Expected Vacancy on the Court

¶ 22. Petitioners contend that respondent has no authority to appoint a successor to Justice Dooley, who has indicated that he will not be seeking retention for another term beyond his current term, which expires on April 1, 2017, months after respondent leaves office. We agree.

11

¶ 23.   The Governor's power to appoint an associate justice of the Vermont Supreme

Court arises from two constitutional provisions that became effective in 1974.[4]   The critical

---

[4]   On April 9, 1974, §§ 32-34 of Chapter II of the Vermont Constitution, among other provisions, "became effective by governor's proclamation" and "put in place a version of the so-called Missouri Plan of judicial selection." Peck v. Douglas, 148 Vt. 128, 130, 530 A.2d 551, 553 (1987) (per curiam). Before then, justices were elected by the Legislature. See Vt. Const. ch. II, § 44 (1972) ("The Justices of the Supreme Court shall be elected biennially, and their term of office shall be two years."); see also P. Gillies, Rumination: The Supreme Court Looks Back, Vt. B.J. & L. Dig., Feb. 1996, at 7 (stating that most justices in history of Vermont Supreme Court "have been elected by the legislature, as that was the constitutional framework for the Court, in annual elections until 1870, then biennial elections until 1974"). Section 32 "provided for filling vacancies in certain judicial offices, including Supreme Court justices, by original appointment by the Governor, with the advice and consent of the Senate, from a list of nominees furnished by a legislatively-established judicial nominating body." Peck, 148 Vt. at 130-31, 530 A.2d at 553. The last sentence of § 36 of Chapter II, also added in 1974, allows the General Assembly to "establish procedures for the implementation of provisions of sections thirty-two through thirty-six." Acting under this authority, the Legislature created "procedures relating to retention and the associated joint legislative committee on judicial retention." Id. at 132, 530 A.2d at 553 (citing 4 V.S.A. §§ 4(c) and 5(a)). "Changes were made in the filing time for declarations by justices of their intention to succeed themselves from the former requirement requiring filing ninety days prior to expiration of the term of office to a specific filing date, September 1 of the year preceding the expiration of the term." Id.

We have examined the available legislative history of the 1974 amendments to the Vermont Constitution that added Chapter II, §§ 32-36, dealing with judicial selection, appointment, confirmation, retention, retirement, and discipline. Prior to the amendments, Superior Court judges and Supreme Court justices were selected by the Legislature, while District Court judges were appointed by the Governor. See generally J. Dooley, The Judiciary in Vermont State Government Since 1965 187, 203-05 (M. Sherman ed., 1999). Each of these judges and justices had set terms, and, in order to obtain a new term, faced retention votes in the Legislature. In essence, the amendments applied the process for District Court judges to Superior Court judges and Supreme Court justices. 1966, No. 64 (The Judicial Selection Act of 1966).

The Legislature created a Constitutional Commission to propose amendments to the Vermont Constitution in 1968. 1967, No. 298 (Adj. Sess.). The Commission's report, issued on January 5, 1971, includes Proposal 5, which contained the proposed amendments to the judicial articles. See Report to the General Assembly of the Constitutional Commission 28-36 (1971). With minor language changes, the proposed articles were adopted by the Legislature and approved by the voters. Unfortunately, the Commission's report is relatively summary and provides little explanation that can guide us in deciding this case. It contains two paragraphs on judicial selection, appointment, confirmation, and retention, as follows:

As regards judicial selection, the Commission believes that the judicial selection board presently existing by statute, the legitimacy of which on occasion has been questioned due to its lack of constitutional sanction, should be provided for and given explicit recognition in the Constitution. As noted above, the concept of the Missouri Plan has been given effect only as to the district judges, and in a modified form as to the supreme court justices and superior judges. The Commission supports the essential elements of this plan as now in effect with regard to the district judges, which contemplates the submission of nominees for judicial offices to the governor by a judicial nominating board, appointment by the governor from the nominees so submitted, and tenure in office thereafter unless voted out of office by a majority of the members of the General Assembly voting on the question at a stated interval. It is the belief of the Commission that this is the best method of selection for the purpose of insuring that persons selected as members of the judiciary will possess the necessary ability and professional qualifications, and that the selection process under this proposal would be as free as possible from the effects of political influence.

While under this proposal the General Assembly will no longer be empowered to elect supreme court justices and superior judges, it is proposed that the consent of the Senate be required for confirmation of all judicial appointments. Interim appointments to fill vacancies occurring between legislative sessions would be made by the Governor, subject to later confirmation by the Senate. This procedure, which is very similar to that which is presently followed in connection with the confirmation of appointments for numerous other positions in state government, would afford the legislature its traditional confirming role.

Id. at 31-32.

While these statements of intent are helpful in providing context for the question before us, they do not show any definitive intent, one way or the other, in resolving that question. Two points are worth making, however. First, the Commission report, as quoted above, makes it clear that it wanted to design a process as free from politics as possible. There is no time requirement for the Judicial Nominating Board to nominate candidates either in the statute or the Constitution. Respondent's position in the case would put the Board in the political position of deciding whether to get its nominations to the outgoing Governor or to wait to get them to the incoming Governor. This was plainly a serious concern when the 1974 amendments were added because, as noted in Peck, under the preexisting law the time limit for a retention declaration was December 1, not September 1 as it is now, thereby requiring a very expedited process for the Board to get names to the outgoing Governor. 148 Vt. at 132, 530 A.2d at 553. If the incoming Governor makes the

13

language in both sections is identical. Section 32 of Chapter II of the Vermont Constitution provides as follows: "The Governor, with the advice and consent of the Senate, shall <u>fill a vacancy in the office</u> of . . . associate justice of the Supreme Court . . . from a list of nominees presented by a judicial nominating body established by the General Assembly having authority to apply reasonable standards of selection." (Emphasis added.) Similarly, § 33 of Chapter II of the Vermont Constitution empowers the Governor, when the Senate is not in session, to "make an interim appointment to <u>fill a vacancy</u> in the office of . . . associate justice of the Supreme Court . . . from a list of nominees presented by the judicial nominating body." (Emphasis added.)[5]

¶ 24. As we stated in <u>Peck v. Douglas</u>:

> The standards for interpreting constitutional language and meaning, though related, are not the same as for ordinary statutes. Canons of construction, if applied, must be used more cautiously and sometimes differently. This is so because a constitutional provision, unlike a statute, usually operates to limit or direct legislative action. The value of resort to any claimed legislative intent in a constitutional amendment is considerably dissipated by the elaborate adoption procedures that also involve the workings of

appointment, however, the political opportunity goes away. Second, the last sentence of the Commission report quoted above likens the appointment process to the preexisting and familiar process involving executive branch officials who are subject to the advice and consent of the Senate. Respondent argues that the processes are different because the Governor only "nominates" judges. Although one could argue that there are differences, the Commission report essentially states that the two processes should be looked at as being the same.

[5] Respondent argues that the Governor is merely nominating a successor under § 32 and not appointing one, as under § 33. Similarly, amicus curiae argues that the Governor's nomination under § 32 is an "incomplete appointment." We find these arguments unavailing. The term "nominate" is used in the Constitution to describe the list prepared by the judicial nominating body. See Vt. Const. ch. II, § 32; see also <u>Wolfe v. Yudichak</u>, 153 Vt. 235, 253, 571 A.2d 592, 602 (1989) ("We find nothing in the [Vermont] Constitution to establish a class of justices with different and diminished powers and prerogatives from those who have been confirmed by the Senate."). Moreover, absent the temporary injunction issued by this Court, the respondent could well have made an interim appointment governed by § 33 of chapter II of the Vermont Constitution because the Senate had not been in session. In any event, the arguments are beside the point. As explained below, there still must be a vacancy to fill, and a vacancy does not exist if an office is occupied.

> constitutional commissions and subsequent submission of the proposals to the people of this state.
>
> It is of great importance to remember that, since the purpose of any constitutional enactment is to delineate the framework of government, the working details are frequently left, as here, for legislative definition. Interpretation must, therefore, not be so narrow as to present an obstacle to that function. More than one pattern of working details may well be possible and constitutional.

148 Vt. at 132, 530 A.2d at 554.

¶ 25. Although our interpretation of the Constitution should not hamstring its implementation, "we first look to the plain meaning of the [constitutional] language in question." State v. Madison, 163 Vt. 360, 368, 658 A.2d 536, 541-42 (1995); see State v. Pellerin, 2010 VT 26, ¶ 7, 187 Vt. 482, 996 A.2d 204 ("Whether looking at a constitutional or a statutory provision, our interpretation begins with the plain language of that provision."). Notably, in this case we are not construing an ancient constitutional provision that would give us pause in applying the plain meaning of the provision's language without considering its historical context. Cf. Chittenden Town Sch. Dist. v. Dep't of Educ., 169 Vt. 310, 327-28, 738 A.2d 539, 552 (1999) (considering historical context in construing meaning of language in constitutional provision first adopted in 1777 with antecedents dating back to seventeenth century). Nor does respondent suggest that the word "vacancy" has a different meaning in the historical context than here.

¶ 26. Thus, we discern no basis for straying from the plain meaning of the governing statutory language of §§ 32 and 33, which grant the Governor authority to appoint a justice only when a "vacancy" in the office exists. The plain meaning of the word "vacancy" is manifest. The leading legal dictionary unambiguously defines the word "vacancy" as follows:

> 1. The quality, state, or condition of being unoccupied, esp. in reference to an office . . . . 2. The time during which an office . . . is not occupied. 3. An unoccupied office . . . .; a vacancy, properly speaking, does not occur until the officer is

15

officially removed. 4. A job opening; a position that has not been filled.

Vacancy, Black's Law Dictionary (10th ed. 2014); see also Afran v. McGreevey, 336 F. Supp. 2d 404, 408-09 (D. N.J. 2004) (holding that governor's announcement that he was leaving office did not create vacancy under plain meaning of word as used in constitutional provision); Clark v. Deal, 785 S.E.2d 524, 527 (Ga. 2016) ("[T]he ordinary meaning of the term vacancy is, in essence, a public office without an incumbent."); Nelson v. Quie, 299 N.W.2d 119, 120 (Minn. 1980) (holding that judge's retirement "creates a 'vacancy in the office of judge,' within the meaning of" state constitutional provision, as of effective date judge was to leave office); Friedman v. Lewis, 598 A.2d 1361, 1363 (Pa. Commw. Ct. 1991) (holding that plain meaning of word "vacancy" in constitutional provision means that office is unoccupied); State ex rel. Witcher v. Bilbrey, 878 S.W.2d 567, 573-74 (Tenn. Ct. App. 1994) (stating that word "vacancy" in state constitutional provision means an office "that is unoccupied or without an incumbent"); State ex rel. Angelini v. Hardberger, 932 S.W.2d 489, 493 (Tex. 1996) (holding that when retiring justice "actually leaves office, he will vacate his office in the constitutional sense"); cf. Afran v. McGreevey, 115 F. App'x 539, 548 (3d Cir. 2004) (holding that "no vacancy" exists in governor's office because governor "has not officially resigned from office").[6]

---

[6] Most, if not all, of the cases holding that a vacancy occurs upon the submission of an irrevocable resignation are construing constitutional language different from ours and involve the necessity of establishing who the candidates are for elective office before election deadlines. For example, in McKenzie v. Edwards, the court held that the resignations given by judges were irrevocable upon receipt by the governor and his proclamation calling for special elections, thereby "creating a vacancy in the office which, under the constitution, may be filled by election, even though the effective date of the resignation is prospective." 361 So. 2d 880, 882 (La. 1978). The court reasoned that "[w]hen the event is so certain to occur there is no legal impediment to anticipating the vacancies or the calling of the necessary elections to fill the vacancies when they become effective." Id. at 883. Doing so, the court explained, would "assure the filling of the vacancies on their effective date by elected judges, a result in keeping with the spirit of . . . the Constitution requiring, with limited exceptions, that 'all judges shall be elected.' " Id. (quoting La. Const. art. V, § 22(A)); see also Allen v. Powell, 244 N.E.2d 596, 597 (Ill. 1969) (holding that

16

¶ 27. Sections 32 and 33 do not empower the Governor "to create vacancies but only to fill them." See State ex rel. Foughty v. Friederich, 108 N.W.2d 681, 690 (N.D. 1961) (construing constitutional provision giving governor power to fill vacancy).[7] When a constitution, such as is the case with the Vermont Constitution, contains no provision authorizing the Legislature to determine when any office shall be deemed vacant, "a vacancy does not exist in a constitutional office so long as the office is supplied in a manner provided by the Constitution with an incumbent

---

state senator's resignation was irrevocable upon governor's receipt, thereby creating vacancy to allow writ of election to be issued in interim between date of resignation and effective date of resignation, after which election would be held, thereby furthering public policy "that there be certainty as to who are and who are not public officers"); cf. Wyler v. Sec'y of Commwealth, 802 N.E.2d 1042, 1045 (Mass. 2004) (holding that constitutional provision providing that vacancy in senate shall be filled by election of people of district did not preclude senate from "preparatory action" of irrevocably accepting state senator's prospective resignation and setting date for special election in circumstances where new public official would not be seated or perform duties until after effective date of vacancy).

[7] A series of Florida Supreme Court cases construing amendments to the Florida Constitution illustrate this point. The court initially construed a provision that, similar to the Vermont Constitution, empowered the governor to fill a vacancy in an office that became open. The court held that "[w]hen an officer tenders his resignation to take effect at a subsequent date, the office does not 'become vacant' until the date on which the resignation becomes effective, though before such effective date of the resignation, the Governor may grant a commission to an appointed successor to be effective the day the resignation takes effect." In re Advisory Opinion to the Governor, 158 So. 441, 442 (Fla. 1934). Construing the same constitutional provision, the court later ruled that "[a] prospective appointment is valid if the governor who makes the appointment is still in office at the time the vacancy occurs and the commission becomes effective." Tappy v. State ex rel. Byington, 82 So. 2d 161, 166 (Fla. 1955) (en banc). Later, however, when the Florida Constitution was amended to provide that a vacancy "shall occur" upon resignation, the court construed the provision by holding that an unconditional resignation "created" a vacancy. Spector v. Glisson, 305 So. 2d 777, 779-80 (Fla. 1974) (discussing 1968 constitutional amendment), superseded by constitutional amendment, Fla. Const. art. V, § 10(a); see also In re Advisory Opinion to the Governor, 928 So. 2d 1218, 1220 (Fla. 2006) (permitting interim appointment when vacancy expected in future); In re Advisory Opinion to the Governor, 600 So. 2d 460, 462 (Fla. 1992) (mem.) (applying Spector and holding that constitution permits interim appointments); cf. In re Advisory Opinion to Governor, 940 So. 2d 1090, 1092-94 (Fla. 2006) (distinguishing prior cases based on constitutional provision concerning merit retention system added by constitutional amendment in 1977 explicitly stating that vacancy existed upon expiration of term of judge or justice).

who is legally qualified to exercise the powers and perform the duties which pertain to it." Id. As the North Dakota Supreme Court stated:

> Any vacancy that warrants an appointment must be a vacancy in the office, not in the term. No vacancy occurs while the office is being held by one occupying it under a tenure prescribed by the Constitution unless the Constitution so provides. As we have pointed out, the Constitution recognizes no vacancies except those which are vacancies in fact. It does not create or declare vacancies in constitutional offices nor does it confer upon the legislature authority to do so.

Id. at 690-91.

¶ 28.    The same is true of the Vermont Constitution.   The section in the Vermont Constitution that permits the General Assembly to "establish procedures for the implementation of the provisions of sections thirty-two through thirty-six" does not authorize the Governor to create, as opposed to fill, a vacancy.   Vt. Const. ch. II, § 36.   Pursuant to that section, the Legislature has established procedures for the filling of vacancies, including those on the Vermont Supreme Court.   Section 602(b) of Title 4 provides that "[w]henever a vacancy occurs in the office of a supreme court Justice . . . or when an incumbent does not declare that he or she will be a candidate to succeed himself or herself [pursuant to 4 V.S.A. § 4(c)], the [judicial nominating] board shall submit to the governor the names of as many persons as it deems well qualified to be appointed to the office." (Emphasis added.)  This provision, upon which respondent relies, cannot expand the governor's power beyond that established in the Constitution.   See Youngblood v. Marr, 254 N.E.2d 868, 871-72 (Ind. 1970) (stating that legislature cannot declare vacancy under constitution when in fact no vacancy exists).

¶ 29.    In any event, § 602(b) does not purport to do so.  Indeed, the use of the word "or" emphasized above indicates that an incumbent not declaring for retention, as was the case here with Justice Dooley, is distinct from the creation of a vacancy.  Section 602(b) does not confer any

18

power on the Governor; rather, it merely allows the Judicial Nominating Board, in anticipation of an expected vacancy, to submit the names of candidates to the Governor, nothing more.

¶ 30.    Other provisions in Title 4 regarding retention procedures support this conclusion. For example, 4 V.S.A. § 4(c) provides that if the General Assembly votes not to retain a justice, "upon expiration of the term of office a vacancy shall exist which shall be filled by appointment in accordance with the constitution and chapter 15 of this title [concerning judicial nominations and appointments]."  We see no reason why a vacancy would exist at the end of a term when a justice is not retained, but before the end of the term when a justice does not seek retention.  In addition, § 5(b) of Title 4 provides that "[a] justice shall remain in office until a successor is appointed and qualified, unless sooner removed for cause or unless he [or she] resigns."  This provision evidences the Legislature's concern that there will be a seamless transition and that the Court will be at full strength in the event the justice's successor is unable to start when a vacancy occurs at the time the term of the outgoing justice expires.  There would be little need for such a provision if the Governor could appoint a successor to a justice before the justice's term of office expired.

¶ 31.    In short, there is no support for respondent's position that the Vermont Constitution gives him the authority to appoint a successor for an opening on this Court that does not become vacant—unoccupied—until after he leaves office.  Respondent cannot complete the appointment process by swearing in a new justice now—effectively adding a sixth justice—because the vacancy does not arise until Justice Dooley leaves office.  See Vt. Const. ch. II, § 56 (providing, in relevant part, that every judicial officer shall take oath or affirmation of allegiance to State of Vermont before entering upon execution of office).  Nor will respondent have the authority to appoint a successor to Justice Dooley at the time the vacancy occurs, after respondent has left office.

¶ 32. We are aware, as was the Legislature in enacting the provisions cited above, that delay in filling a vacancy has the potential to create confusion and disorder in public service. For that reason, those provisions, including § 602(b), allow a portion of the appointment process to proceed on an anticipatory basis so that when the vacancy becomes effective the appointment and transition can be made as seamlessly as possible. But none of those provisions give, or could give, the Governor authority to appoint a successor to a justice whose term expires, and thus becomes vacant, after the Governor leaves office.[8] As the court in Terry v. Cornett stated:

> If it was necessary in all cases to delay making an appointment to fill a vacancy until the office was actually vacant, much confusion and disorder in the public service might be occasioned, and so we think that an appointment may be made within a reasonable time before the vacancy actually exists, to take effect when it occurs, if it be made by the authority that would have the right to make the appointment when the vacancy does occur. A person cannot be appointed presently to fill a vacancy when there is no vacancy, but he [or she] can be appointed to fill a vacancy that will shortly occur; his appointment to take effect when it does. This view of the law . . . is generally accepted as correct. We can well understand that there might be good reasons presented against the practice of making an appointment to fill a vacancy that would occur at a distant date, and have no doubt that it would be very objectionable to allow an official to make an appointment to take effect in the future when the vacancy to fill . . . would occur in the term of a succeeding

---

[8] Amicus curiae points to past examples where governors appointed justices or judges in anticipation of a vacancy. None of those appointments were challenged, and none involved situations where the Governor would no longer be in office when the vacancy become effective. The case amicus curiae cited at oral argument, McRae v. State ex rel. Hyche, 112 So. 2d 487, 488 (Ala. 1959), is not on point and does not lend any significant support to respondent's position. In that case, an incumbent sheriff was reelected and thereafter duly qualified to commence a second term of office that was to begin on January 20, 1959. When the sheriff died on December 24, 1958, the current governor appointed a successor for the remainder of the sheriff's unexpired term and for the new term commencing on January 20, 1959. The new incoming governor, whose term of office began on January 20, 1959, appointed a different successor to the late sheriff for the new term. Construing statutory and constitutional law, the court found in favor of the former governor, ruling that the sheriff's death created a vacancy in his office that the then-current governor could fill, notwithstanding the fact that the governor's term expired before commencement of the new term. Id. at 489-92. We find little factual or legal similarity between this case and the case before us.

20

official. To uphold the validity of such an appointment would oftentimes enable an official to take from his [or her] successor a part of the rightful powers and emoluments of his [or her] office and surround him [or her] with . . . appointees not in harmony with his [or her] methods, or in sympathy with his [or her] purposes.

124 S.W. 870, 871 (Ky. 1910) (citations omitted); see also Murphy v. Pearson, 667 S.E.2d 83, 85 (Ga. 2008) (recognizing "the common-law rule that a public body empowered to appoint a public officer may not forestall the rights and obligations of its successor by making an appointment where the term of the appointee will not take effect until after the expiration of the term of the appointing body" (quotation omitted)); Gonzalez v. Bd. of Educ. of Elizabeth Sch. Dist. Union Cty., 738 A.2d 974, 978 (N.J. Super. Ct. App. Div. 1999) (explaining that "a prospective appointment usurps the will and power of [a future public body] to fill a vacancy based on the [future public body's] consideration of prevailing policy"); State ex rel. Norman v. Viebranz, 483 N.E.2d 1176, 1178 (Ohio 1985) ("Prospective appointments to office are generally deemed to be effective, with this exception: If the term of the appointing body or officer will expire prior to or at the same time that the vacancy will occur, then no power of prospective appointment exists.").

¶ 33. We conclude that the Vermont Constitution does not authorize respondent to appoint an Associate Justice of this Court in anticipation of a vacancy that is not expected to occur until the expiration of the justice's term of office, which will occur months after respondent leaves office. In so holding, we emphasize that our decision today rests entirely upon the meaning and purpose of the Vermont Constitution. We reach our decision having in mind the overarching principles of our democracy: the integrity of our governing institutions and the people's confidence in them. The particular identity of the parties or potential nominees to the Office of Associate Justice have no bearing on our decision. Our sole responsibility in this, as in any, case is to apply the law evenhandedly, regardless of the identity of the litigants, the sensitivity of the issues, or the passing political interests of the moment. As we have elsewhere observed, "[o]ur constitutional

21

responsibility to consider the legal merits of issues properly before us provides no exception for the controversial case." <u>Baker v. State</u>, 170 Vt. 194, 197, 744 A.2d 864, 867 (1999).

<u>Respondent is not constitutionally authorized to appoint a successor to the office held by Associate Justice John Dooley.  Mandate to issue forthwith</u>.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Walter M. Morris, Jr., Superior Judge (Ret.),
Specially Assigned